Page 1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

--------------------------------

ESTATE OF MARTIE CLARK, et al.,

Plaintiffs,

vs. : CASE NO. 1:15-cv-00512-MRB

HAMILTON COUNTY, et al.,

Defendants.

--------------------------------

Deposition of: THOMAS FOWLKES, MD
Taken: By the Defendants Pursuant to Notice

Date: January 29, 2018

Time: Commencing at 1:39 p.m.

Place: The Law Offices of Blake R. Maislin, LLC
2260 Francis Lane
Cincinnati, Ohio 45206

Before: Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

Page 2

APPEARANCES:

On behalf of the Plaintiffs:

Randy A. Byrd, Esq.
of
The Law Offices of Blake R. Maislin, LLC
2260 Francis Lane
Cincinnati, Ohio 45206
Phone: (513) 444-4444
Email: rbyrd@maislinlaw.com

On behalf of the NaphCare Defendants:

Carrie M. Starts, Esq.
and
Robert W. Hojnoski, Esq.
of
Reminger Co., L.P.A.
525 Vine Street
Suite 1700
Cincinnati, Ohio 45202
Phone: (513) 721-1311
Email: cstarts@reminger.com
rhojnoski@reminger.com

On behalf of the Hamilton County Defendants:

Mark C. Vollman, Esq.
and
James J. Barbiere, Esq.
of
Office of Hamilton County
230 East Ninth Street
Suite 4000
Cincinnati, Ohio 45202
Phone: (513) 946-3115
Email: mark.vollman@hcpros.org
jim.barbiere@hcpros.org

Page 3

APPEARANCES: (CONTINUED)

Also Present:

Linda Lou Clark

- - -

Page 4

I N D E X

| THOMAS FOWLKES, MD | PAGE |
| --- | --- |
| Examination by Mr. Hojnoski | 5 |

(No exhibits.)

- - -



Page 5

THOMAS FOWLKES, MD
of lawful age, a witness herein, being first duly sworn as hereinafter certified, was examined and deposed as follows:

EXAMINATION

BY MR. HOJNOSKI:
Q. Doctor, please state your full name for the record, and spell your last name for us.
A. Thomas Fowlkes, F-o-w-l-k-e-s.
Q. And, Doctor, what is your current profession?
A. Medical doctor.
Q. And what states are you licensed in?
A. Mississippi.
Q. Any other states?
A. No.
Q. Do you have any board certifications?
A. I do.
Q. Please identify those for the record, if you would?
A. Emergency medicine and addiction medicine.
Q. Do you have any specialized training in pathology?
A. I do not.
Q. What about neuropathology?

Page 6

A. I do not.
Q. What about cardiology?
A. As a portion of emergency medicine. Cardiology is a substantial portion of the curriculum and training in emergency medicine.
Q. Have you ever participated in an autopsy?
A. Have I ever -- I have never done an autopsy. I have -- I have served as the assistant medical examiner and investigator for my county, and that involves participation in multiple autopsies, but I do not perform autopsies myself.
Q. Have you ever had any specialized training with respect to the analysis of postmortem tissue slides?
A. No.
Q. Tell us about your experience with respect to correctional health care, correctional medicine.
A. I have been medical director at the Lafayette County, Mississippi Detention Center for the last 20 years.
Q. And if I read your CV correctly, that -- for a number of years, that was as a contractor to that facility, and now you're directly employed. Did I read that correctly?
A. That's right. Not only was I a

Page 7

contractor, I contracted to provide services. So I provided all outpatient health care services. So I employed the nurses, furnished medications, furnished outpatient services.
Q. From a contract standpoint, how did that work? Was it you directly contracting with the Lafayette Detention Facility, and then, in turn, you contracting with various health care providers in other specialties?
A. Well, I had a -- I have a corporation, Thomas Fowlkes, MD, PA, that contracted to provide services. Then I directly employed the health care workers and contracted out things like dental services, but -- and lab services, x-ray services, yes, but the -- I was the direct employer of the employees.
Q. Understood. Initially when you said it, I thought you had independent contracting relationships with others, but you actually had direct employees?
A. For the nurses, et cetera, yes.
Q. How many employees did you have under your care?
A. Well, I'm sorry, ask the question again.
Q. How many employees did you have?
A. I had one full-time nurse, two part-time

Page 8

nurses, a nurse practitioner, a paramedic, during some of those periods of time.
Q. How large is this facility?
A. It's 175 beds.
Q. Do you know how that compares to the Hamilton County Justice Center?
A. I believe that the Hamilton County Justice Center is more on the order of 1800 to 2,000.
Q. All right. And as such, there's a requirement for a larger staff, you would gather, at the Justice Center here in Cincinnati, Ohio?
A. Yes.
Q. And that's why I was asking how many employees you had. I was trying to get a sense for your medical staff and how many bodies you needed to provide care to. Plus or minus 175 inmates?
A. Yes, that's right.
Q. Are all 175 beds normally filled?
A. Well, over the years, it's up or down. It has been, you know -- right now, I think there are about 140. We've had as many as 200. We are a federal holding facility; so about half of my detainees are federal pretrial detainees.
Q. With respect to any medical policies or health care policies at your facility, are they



Page 9

created by you?
A. They are.
Q. Do you have a policy and procedure manual or handbook?
A. We do.
Q. And has that changed over the years?
A. It has not changed in a number of years and -- it has not changed in a number of years. In fact, I'm beginning a rewrite at this time.
Q. When did you become directly employed by the Lafayette Detention Facility?
A. Approximately two years ago.
Q. Was there any reason for that change?
A. There was tort reform in Mississippi in about 2008 giving more governmental immunity to physicians who are employed directly by -- who are employed directly by governmental entities. And so I decided that it would be a better arrangement for me to be a direct employee of the county. So I asked the county, and they agreed.
Q. So now you have qualified immunity defenses and others that you didn't have when you were independently contracted by the facility?
A. That is correct.
Q. Have you been sued before?

Page 10

A. I have not.
Q. Have any of your staff been sued before?
A. No.
Q. Okay.
A. There may have been a suit against the jail, not really directly related to medical services, but nothing -- none of my employees -- neither me nor any of my employees have been named.
Q. In the 20 or so years that you've been the medical director at the Lafayette County Detention Center, have there been any lawsuits filed by inmates or estates of inmates that relate to medical care in any way?
A. Not that I'm aware of.
Q. You said -- well, maybe you can give me a percentage. What percentage of the inmates at that facility are there merely kind of temporarily as a federal inmate, moving on to a federal prison presumably?
A. Well, actually my federal detainees are my longest staying people.
Q. Okay.
A. So we have a county jail, and so a number of people are brought in on county charges. We're a college town. We have a number of intoxicated

Page 11

college students who come in, bond out. Then we have people who are facing state charges; so they're county or state pretrial detainees.
We do not house people who have been convicted -- once they've been convicted, we send them to the state prison system. And then we have federal pretrial detainees, but that is often a two- or three- or four-year process, I mean, often a prolonged process to work their way through the system.
Q. And just for my clarification, is that just because the federal process takes longer to kind of figure out where they're going, or if they're going to be convicted of a federal charge?
A. Right. There have been backlogs -- we're actually better now, but there have been backlogs in the federal system. So we're -- we will have a person detained on a charge they -- if they don't bond out, it might be 18 months to two years before they either plea or a trial is held.
And then if they're convicted or if they plea, it might be another nine months before the probation service completes their pretrial -- I mean, sorry, presentencing report. And so then it's a while before they're sentenced and then designated

Page 12

and move on.
Q. What percentage of the individual that -- first of all, is it all male or is it mixed?
A. No, it's mixed.
Q. Mixed. What percentage of the inmates that come to that facility have some sort of addiction issue?
A. I do not know if I could give you a specific number, but there are certainly in any -- as with any jail, any county jail, a substantial number of people with substance abuse issues.
Q. Is heroin an epidemic where you live, in your community?
A. It has become so, yes.
Q. And what period of time has it -- have you seen more of those cases?
A. In the last ten years.
Q. Do you have a specific policy that you've put in place with respect to heroin withdrawal or detox of inmates that come to your facility?
A. I do.
Q. And is that in writing?
A. The -- my protocols and the flow sheets are in writing. I don't believe it's in our -- actually in our policy and procedure manual. I



believe it is a worksheet.
Q. Explain that to me. What's the distinction? Do you have a written heroin detox procedure at your facility?
A. I have written instructions to our nurses. So I have written instructions to the nurses that is not -- I don't know that it has ever been incorporated within the policy and procedure manual itself, as opposed to written instructions.
Q. In what format are those written instructions? Are they, I mean, on a document that has a title? What would we call those, so that we can request them after this deposition? How do I identify those?
A. Quite honestly, I don't know. I guess it might well be my standing order, my protocol, I guess would be the title of the document.
Q. Well, if I do a public records request to the facility that you're the director of, how would I identify, by title or otherwise, any and all written documents that are in place at that facility with respect to heroin detox or withdrawal?
A. I don't know that you -- I don't know that you would. I mean, I have a written -- I've -- I have a written protocol for the number of days which

I give buprenorphine, but I don't know that -- I'm not even sure where it is at this moment. I don't have a specific -- in other words, it's not part of our policies and procedures. We don't have policies on the individual treatment of disease states.
Q. For any disease?
A. No, not for any disease.
Q. Do you have anything in writing with respect to monitoring your inmate's nourishment or hydration?
A. No.
Q. Tell me the capabilities medically at the Lafayette Detention Facility. In other words, what can you do there? Can you take an EKG, x-rays, labs? Give me some examples.
A. Okay. We are able to draw labs. We do not have in-house lab services. We have a courier service, next day lab services. We have x-ray service via -- we have x-rays available via a mobile x-ray service so that they can be done in-house.
Q. Okay.
A. We then have them sent out and processed and read by a radiologist.
Q. Okay.
A. We do have -- we have an EKG -- we have

EKG services. We have the technical capability -- in fact, I think we have IV solutions, but it's not my practice to provide IV therapy.
Q. Okay.
A. We have a -- so we have a kit. We have an emergency -- emergency resuscitation kit, but we do not normally provide IV fluids.
Q. If someone needed an IV, they'd have to go out for that?
A. Yes.
Q. Do you have a medical unit, a dedicated medical unit?
A. No, we do not.
Q. So where is medical care provided, in the cell, or is there -- in a general, you know, lobby area?
A. We have -- so we have a medical clinic -- we have a clinic. We have a medical office. We do not have beds which are directly designated as medical beds. We don't have an infirmary. We don't have 24-hour-a-day nursing in our facility either.
Q. Okay.
A. So we don't have dedicated medical beds. Our reception area, our booking area, contains approximately maybe 15 -- approximately 15 cells, and

we keep -- medical inmates with special medical needs are housed in one of those booking area cells on a longer term basis. So, for instance, that is our -- suicide watch cells are in the booking area.
Q. Did I hear you correctly that there is not a medical employee, either a nurse or a physician or a medic, that is on premises 24 hours a day?
A. You did hear correctly.
Q. So what are the hours that someone is there? Do you have a nurse come for med pass in the morning, afternoon, and evening?
A. So we have a nurse who -- my primary nurse works full time. She doesn't have necessarily set hours, but, in general, 8:00 to 5:00. And she is also on call 24/7, as I am.
Q. Okay.
A. Then we have two part-time positions, one an evening part-time nurse and one a weekend part-time nurse. Those are actually both filled by the same person right now.
Q. And part time is how many hours?
A. I don't know exactly. I want to say maybe 15 to -- 15 hours, perhaps.
Q. You're full time at the facility, or are you just on call?



Page 17

A. No. It is -- it is one of my jobs; so it's not my only job.
Q. Okay.
A. And I am on call. I am -- I work 24 hours a day. I mean, I'm on call. I'm responsible for the care delivered 24 hours a day.
Q. You're currently in Cincinnati. So who is monitoring or on call in your absence?
A. My -- so --
Q. Do you have backup?
A. The short answer is yes. I have a nurse practitioner who is on call -- well, I'm sorry, strike -- let me start over with that.
My nurse practitioner is normally not on call. She normally holds sick call, and so -- but she and my nurse know when I'm not going to be available for a period of time, and so they're -- they cover for me. And if I'm truly not available, such as out of the country, I have a physician cover for me.
Q. And other than your full-time nurse, who you said is roughly 8:00 to 5:00, is that Monday through Friday?
A. Yes, but she works a lot. I mean, she works a lot. She's probably there seven days a week.

Page 18

She's on call 24 hours a day.
Q. Well, when you say "on call," is that just you're called in for emergencies, or you're there to do, you know, daily rounds?
A. I'm sorry, who are you talking -- who are you referring to, the nurse?
Q. The nurse, the full-time nurse.
A. So --
Q. You said she's on call. What does that mean, that she's on call for emergencies or she's on call for --
A. She is on call for emergencies, but, also, since we don't have a nurse on duty over the night shift. So, for instance, if we -- if they received an inmate in booking, and they're doing the medical screening, and they have a bag full of medicines which the people say they need tonight, then they will call the nurse and ask her what to do, or sometimes, you know, questions about whether the person should be referred out for medical clearance before being accepted, or emergencies, all those things.
Q. How many hours do you work in the facility per week?
A. I don't have a set schedule.

Page 19

Q. On average? Do you have to keep track of your hours?
A. I do not. I couldn't give you an average.
Q. You're not paid by the hour? It's a salary position?
A. That's correct.
Q. And what is your salary as a public official, I assume, public employee?
A. I presume so. I believe it's $25,000.
Q. A year?
A. Uh-huh.
Q. And does that amount of money reflect at least the anticipated number of hours or time that you may be spending at that facility, like if you were to do the math and, you know, on a per hour basis or otherwise?
A. I would presume so.
Q. Do you know what that equals out to be?
A. No. I mean, I don't --
Q. Did you --
A. I'm sorry, you might have to ask the question again.
Q. When your salary was set, was -- I assume that there was some basis for how many hours you were expected to be there on a week or, you know, weekly

Page 20

basis, so that you could do the math and figure out what's a reasonable sum of money for a physician of your number of years of experience?
A. No, it wasn't arrived that way.
Q. Okay.
A. And one of the reasons I need to clarify, one of the reasons is that I used to, until approximately two years -- two or three years ago or -- it was before we -- before I became a county employee, the -- I actually held sick call. I was the primary provider of sick call. Somewhere along the way, I have hired a nurse practitioner to do the bulk of the sick call.
Q. Okay.
A. And so I am not the primary sick call person. So that's why I don't have more set hours. So now my main responsibility is I have something that I call medical director's clinic, where I go and see anyone who is having problems after she has had clinic. And then I stop by there on a -- not every single day, but on a frequent basis to, you know, take care of problems, et cetera, and, in addition to that, be on call. So I don't have a set number of hours.
Q. So any sick slip that an inmate has, do



you call those slips anything? Do you call them kites?
A. Well, we call them a sick call requests. I think kites --
Q. You've heard --
A. I think kites is a little bit of a -- too much of a slang term, but, yes, some in our facility refer to them as kites.
Q. And I only use that word because in other cases, in other depositions, that's what people refer to them as.
A. We call them a sick call request.
Q. So a sick call request is not something that you're directly responding to. You have a nurse practitioner that does that?
A. Yes, or the -- well, the nurse or the nurse practitioner.
Q. What's your full-time nurse's name?
A. Mary Sellers.
Q. Spell that for me, the last name.
A. S-e-l-l-e-r-s.
Q. Is she an RN?
A. Yes.
Q. And what's your nurse practitioner's name?
A. Courtney, and I can't spell that. I'm not

sure about the first name, if that's "i" or "y." Sessums, S-e-s-s-u-m-s.
Q. And they're both licensed in Mississippi, that's where their licensure is?
A. Yes.
Q. You were talking about your -- the capabilities medically, and you said you can draw labs. You can have a service that can come in and do a mobile x-ray. You can do an EKG?
A. Uh-huh.
Q. That's with your own equipment?
A. Yes.
Q. You don't do IVs. Whether you technically could or not, it seems like that's questionable, based on your emergency kit.
A. We have an emergency kit that has IV start material in it, but I --
Q. And what else? The emergency kit also would allow you to do a -- would it allow you to do a trach?
A. Yes.
Q. Do you have a defibrillator on site?
A. Yes.
Q. You don't have a pharmacy, I assume?
A. No.

Q. Do you use a dedicated pharmacy to get medicine?
A. Yes.
Q. And is that delivered?
A. Yes.
Q. How often?
A. Daily.
Q. Okay.
A. We have a primary daily mail order -- I mean, primary daily delivery and then a local drugstore as our backup.
Q. Things that you can do. You can take blood pressure. You can take temperature?
A. Yes.
Q. You can have a stethoscope, I assume?
A. Yes.
Q. What other things do you have that would represent your capabilities there in terms of treatment?
A. I suture people. I don't expect other people to suture people, but since I'm an emergency physician by training, I suture people. Drain abscesses, provide injection medications, provide follow-up, normal -- I mean, I say normal -- follow-up care from hospitals, wound care, those

kinds of things.
Q. If you give an order to prescribe a medication to an inmate, how long does it typically take to get that medication processed, filled, and back to the facility?
A. Most of our medications that are used either for detox or antibiotics or other -- other acute medicine, so antibiotic courses of medications, we have a -- I forget the name of it, but a starter pack essentially, where we can begin the medication, and then the pharmacy replaces our starter pack. So not with -- so the blood pressure medicines, I don't know -- I mean, I believe the next day, but I'm just saying, you know, normally they send all the medications for the entire month at one time or whatever place. So typically, though, the next day we can get medications, and if, as I said, if we need medication that day, we have a local pharmacy that we use.
Q. That has, I'm sure, set hours? It's not a 24-hour pharmacy, right?
A. That's correct.
Q. And so for, you know, a lot of the medical services that you need, some of it's dependent on presumably the service that provides the mobile x-ray



or the lab that you use in terms of their backlog and openings and all that; would that be fair?
A. Well, there are certainly particular constraints based upon those, what time the lab services send a courier once a day, et cetera, yes.
Q. If an inmate has an issue or is -- you know, a guard recognizes an inmate is having an issue in the middle of the night, whether it's chest pain or trouble breathing, et cetera, what typically happens at your facility? They call you? They call 911? They assess it on their own? I know it's a general question, but just in general.
A. They certainly have the authority to and do sometimes call 911 on their own. They're -- they have the authority to do that, and they know that they are welcome to do that if they believe they have an emergency.
They can also call the nurse for questions. I mean, they can call the nurse for advice, or they can call me. In the last few years, they depend more on my nurse. So I receive less middle of the night calls than I used to, but I used to receive a lot of calls, and they're welcome to call me. They mainly call me if they think I'm going to need -- they call me directly if they think I'm

going to need to come to the jail, and so --
Q. Because your nurse practitioner, she could prescribe like you can, correct?
A. Yes, but the nurse -- I'm talking about my nurse.
Q. Oh, your nurse. Your nurse.
A. My nurse practitioner only holds sick call one day. I mean, she's a strict -- she's strictly a contract employee for sick call one day a week. She works in the emergency department full time.
Q. So Courtney Sessums, she comes -- she has a dedicated one day a week where she'll see inmates that have put in a sick slip?
A. That's right.
Q. What day or hours is that?
A. It -- she works full time in the emergency department, and typically it's on Wednesday or Thursday, whichever of those two days she isn't scheduled to work at her full-time job. So it varies between Wednesday and Thursday.
Q. So if an inmate puts in a sick slip on Saturday, it might not be until the following Wednesday that they get seen?
A. Well, of course my nurse has -- my nurse handles nurse -- what we call nurse sick call, but, I

mean, over-the-counter medications. So my nurse has -- she does that on each of the days that she is there, and then quite often, if there's anything that's urgent, I would have seen them in my rounds. I mean, I would come around and someone would tell me there was -- we need to see this person in advance.
Q. Well, I tried to drill down a little bit on that, the time you're there and, you know, the days or hours that you're there. You just said your rounds. I mean, I don't -- what does that mean?
A. I said when I -- so I go to the facility, meaning mornings. I go there, and then if the nurse says, hey, there's -- Mr. So-and-so has put in a sick call request, I think we should see him, he has -- he says he has X, Y, or Z.
Q. Okay.
A. I will see him aside from the regular time.
Q. Ms. Sellers, I'm sure she's a very fine RN, but as an RN, she's not allowed to diagnose, correct?
A. She does not diagnose, no.
Q. And she does not prescribe?
A. No, she does not.
Q. She doesn't order treatment, other than

giving maybe a Tylenol or over-the-counter medications?
A. Over-the-counter medications.
Q. And I presume that's because you have a PRN standing order in that regard?
A. For over-the-counter medications, yes.
Q. What are the standing orders that you have that Ms. Sellers, as your full-time RN, is able to follow? In other words, things she's able to do without calling you directly?
A. Without calling me directly?
Q. Yeah.
A. Over-the-counter medications only.
Q. She can give Tums, she can give Tylenol, stuff like that?
A. Right. Multivitamins, foot cream.
Q. How often -- well, strike that.
You said that -- we talked a little bit about whether or not there were any written protocols at your facility with respect to heroin withdrawal or detox, and you said no, but there are certain things my nurse knows to do; is that correct?
A. Yes. I mean, I have a standard -- I actually use buprenorphine at my facility to detox.
Q. Okay.



Page 29

A. And I have a standard -- I actually have a shorter and a longer taper, and she knows what those tapers are. And she cannot start them, but she will call me and I will say, let's start the 7-day taper, and she knows what that is.
Q. For the record, give us an overview of that treatment and that medication.
A. Of what the medication is?
Q. Yeah, what it is, what it's designed to do. You said we have that program at our facility. I think implicitly that probably suggests that not every correctional facility uses that. And at the end of the day, a judge might be reading this transcript, has no idea what you're talking about, so I just want you to explain it.
A. Okay. Well, if you don't mind my saying first, I became interested in addiction medicine because I started seeing heroin and opiate withdrawal at my jail. Not just opiates ten years ago, but I started seeing more and more problems with substance abuse, and I felt that I could do a better job of doing detox at my facility. So I got interested in that.
I became -- I got the waiver to prescribe Suboxone. That's a specific request, you know, a

Page 30

specific DEA you have to get. I got that not for the purpose of prescribing Suboxone to -- for maintenance treatment, but for detox at my jail.
I subsequently became interested in addiction medicine, became board certified in addiction medicine, and opened a drug and alcohol treatment center because I was the only person in town doing detox. And so people would call me and send people to the jail, and so basically I opened another treatment facility.
Suboxone is a combination of two medications, buprenorphine and naloxone. And buprenorphine is an opioid that has agonist and antagonist properties; so it -- essentially it eliminates withdrawal symptoms.
It's combined with naloxone, which is an opiate antagonist. The purpose of it being in there is to prevent one from injecting it. The active ingredient is buprenorphine.
And if you give buprenorphine to someone who is opiate dependent, you can treat or prevent opiate withdrawal symptoms. It's used more for long-term maintenance treatment than it is for detox.
Q. And just because of the chemical composition of that specific drug, that's just its

Page 31

intended purpose in terms of long-term maintenance?
A. The -- that's its indication is for the treatment of opiate addiction and the -- especially as more years have gone by, the federal government is promoting it more and more for longer term maintenance, to prevent people's relapses on to other opiates. So it's basically indicated for and mainly used for the long-term treatment of opiate dependence.
Q. When did you first start using that regimen in your facility?
A. Approximately ten years ago.
Q. What is your understanding as to the number of correctional facilities in this country currently that use a similar program for treating for heroin withdrawal?
A. Relatively few.
Q. And do you have a philosophical view on that, or a reason why that is?
A. I believe that -- I don't have necessarily a philosophical view. I believe that most facilities don't -- don't want to control a substance in their jail, and they are concerned about the abuse potential of buprenorphine. And so they have made a decision not to use it for long-term maintenance,

Page 32

which I agree with, not using it for long-term maintenance.
Q. Because it has opiates in it, correct?
A. That's right. So having made the decision not to use it for long-term maintenance, I guess they -- most facilities just don't use it for detox as well. I believe it's very effective for detox, and that's not the way that I use it, not for long-term maintenance at my facility.
Q. Does it have an approved FDA use, purpose?
A. The treatment of opiate addiction.
Q. Not for the treatment of heroin withdrawal?
A. No, that's not correct.
Q. Okay.
A. It is indicated for the treatment of opiate addiction. I mean, that -- and heroin withdrawal, by definition, a person or -- who is having heroin withdrawal would be an opiate addict, and so it is indicated for the treatment of opiate addiction, opiate dependence.
Q. You said there's a short- and long-term -- I forget the word you used, but --
A. Course.
Q. Course. Is that the strength of the drug?



Page 33

A. No. It's for a longer -- for 7 days versus 14 days.
Q. And what's the distinction? How do you make a distinction?
A. Primarily people who are addicted to methadone, who are dependent upon methadone, will have a more significant withdrawal and a longer withdrawal. So I use a longer taper for patients who are dependent upon methadone, as opposed to other opiates such as heroin.
Q. So I think, have you described, at least in your general terms, buprenorphine, for purposes of this record at this point?
A. I believe so.
Q. And naloxone, can you describe that? Is that -- that's different?
A. It is a different drug.
Q. Okay.
A. It is a pure opiate antagonist. What that means is that it attaches to the opiate receptors and knocks any opiates off. It is mainly used for opiate overdoses when used in its other form, and it's usually injected or given intranasally. It's in this preparation, as I said, primarily to keep people from abusing it by injecting it.

Page 34

The idea was that if you injected it, you would -- the buprenorphine -- I mean, I'm sorry, the naloxone would cancel the effects of the buprenorphine, and you wouldn't be able to abuse it. That's the purpose of it.
Q. So you take them both?
A. You do. There -- it's a combination pill, and you dissolve it under your tongue.
Q. Okay.
A. You don't swallow it.
Q. Standing alone, though, just -- and some of this, I just -- if someone reads this, their head would spin if they didn't have some background on this. Standing alone, if you just took naloxone and then injected heroin, your body would not appreciate the effects of heroin. Do I understand that correctly?
A. That's correct.
Q. And it can also be used postinjection of heroin to reverse the effects?
A. That's right.
Q. Okay.
A. And it will cause the -- it will precipitate opiate withdrawal if you are to give it to a heroin addict who wasn't overdosing or anything,

Page 35

you just were to inject it into a heroin addict, they would immediately develop pretty severe opiate withdrawal.
Q. And the withdrawal symptoms that naloxone causes in the human body are what?
A. Withdrawal symptoms are, number one, GI effects, gastrointestinal effects, nausea, vomiting, diarrhea. In addition to that, muscle cramps, muscle pain, bone pain; rhinorrhea, nose running; lacrimation, eyes running; piloerection, hairs standing up or goose flesh; and malaise, in what is described as a bad case of the flu, so feeling bad.
Q. Heroin withdraw in general is often, at least to the layperson, equated with going through the flu or having flu-like symptoms?
A. Having a terrible case of the flu, yes.
Q. So since you have used or gone to a controlled substance treatment for those that are coming into your facility having an addiction to heroin or other opioids, do you have to go through special procedures to make sure that's under lock and key, and, you know, are there certain requirements you have to -- from a security standpoint you have to follow?
A. Yes. So buprenorphine or Suboxone is a

Page 36

controlled substance.
Q. You're using those two words interchangeably?
A. Suboxone is the brand name. Suboxone consists of two medications, buprenorphine and naloxone in the same pill, which is dissolved under your tongue. The active ingredient is really buprenorphine, and it is sold by the brand new Subutex. So it's -- the active ingredient, what I'm using it for, is the buprenorphine.
Q. But it does have naloxone in it?
A. It does, but that's not the active ingredient. So -- in fact, yes, that's not the active ingredient.
Q. So is it kind of a lower dose, so it doesn't really elicit a lot of withdrawal symptoms? Because if you're using it for withdrawal, I presume you don't want to list the withdrawal symptoms?
A. They formulate it as such that when you take it under your tongue, like you're supposed to, it's not enough naloxone to cause withdrawal. Whereas, if you were to inject it, it would cause withdrawal. So it's designed not to cause withdrawal.
Q. Do you have inmates that occasionally come



Page 37

into the jail that are on an outside Suboxone treatment plan?
A. I do.
Q. And explain to me kind of what that plan is, and the type of people that you see coming in, and then what you do to maintain that presumably?
A. Okay. So Suboxone is used in the treatment of opiate addiction. So, for instance, if a person has a heroin addiction, and they want to stop using heroin, they would go to a physician who is authorized to prescribe buprenorphine or Suboxone. They would transition them from the heroin to Suboxone. I say transition them because you have to be in some amount of withdrawal before you start Suboxone.
You start Suboxone, and that eliminates the withdrawal symptoms. And then often it is used for maintenance. So potentially for the rest of their life, they are on a daily dose of Suboxone.
The recommended dose, according to the FDA, is 8 milligrams to 24 milligrams per day, and there's no -- there's no length of time that is specified. As I think I mentioned earlier, the federal government is pushing us -- or pushing the addiction community to leave people on it longer and

Page 38

to keep people on it for the rest of their lives as a maintenance treatment.
Q. So to a layperson, this plan is essentially putting individuals on some amount of opioids for long term?
A. That's correct.
Q. Are you aware of any studies that have been done or maybe are in the works to study the long-term health effects of long-term Suboxone treatment?
A. There are not good long-term studies. There are studies that show that the federal government leans upon the -- leans upon short-term studies, which show that one has fewer heroin -- that people have fewer heroin overdoses if they're taking Suboxone. Which is not a big surprise, if one is giving them an opiate, that they would have -- that they would take less heroin. So that's the government's rationale or the -- yeah, the government's rationale.
Q. Is that also because there's naloxone in it, which counters the effects?
A. No.
Q. What -- I must be missing something then.
A. You're giving them an opiate; so they

Page 39

don't -- it's not a big surprise that they don't take as much heroin if they -- if you're giving them a prescription opiate.
Q. But let's say they do. I mean, let's say -- I mean, it's a smaller dose of opioids, though, is it not? And if someone wants a stronger dose and they go inject heroin, I was just saying, isn't that counterbalanced by the naloxone that they're taking?
A. The naloxone doesn't have anything to do with it. The buprenorphine itself is a special kind of opiate with what is called ceiling properties. And so it binds very tightly to the opiate receptors, more tightly than heroin does, and you cannot overdose and die on buprenorphine.
So no matter how much you take, when your opiate receptors get saturated, it has what is called a ceiling effect. You don't die from it, that's number one. Number two, it's tighter, it binds tighter to those opiate receptors than heroin does.
So if you shoot heroin and have been taking buprenorphine, you won't get any effect from the heroin. You don't -- you don't get a high from the heroin. So there's no reason for people to take heroin on top of buprenorphine.

Page 40

Q. And that what I thought I understood you to say earlier, and that's -- I guess that was my question. So there's -- you can't go get a -- someone just taking, again, a smaller, presumably safe daily dose of opioids as prescribed, they can't go get more bang for their buck by injecting IV heroin --
A. That's right.
Q. -- because it just doesn't -- their body doesn't respond?
A. It doesn't work, that's right. That's right. It's just not because of the naloxone. It's because of the buprenorphine itself.
Q. Do you know whether or not the medical community or the addiction community is going to start studying in more detail the long-term effects of this treatment, of this Suboxone treatment?
A. I hope so.
Q. Because we do have some literature, do we not, and some data to this point in terms of the health effects of long-term heroin use?
A. Right.
Q. And long-term opiate use?
A. Right.
Q. Correct? I presume that it's theorized



Page 41

that the amount of opioids that are -- that an individual is getting through buprenorphine of 8 to 24 milligrams a day is of a safe therapeutic level and not likely to cause long-term health effects?
A. I don't theorize that.
Q. So you think it might cause long-term effects?
A. Absolutely.
Q. And is that -- okay. So when the government says -- or when you say the government is --
A. Encouraging.
Q. -- encouraging, requesting, that the addiction community keep individuals on buprenorphine on a longer-term basis, presumably that request or encouragement is to try to stop the overdose deaths, I assume?
A. I assume.
Q. But beyond that, in terms of long-term effects or chronic illness or disease that may stem from this, we just don't have enough information at this point in time?
A. We don't. We don't. And it's not my -- in my drug and alcohol treatment program, I don't use buprenorphine long term.

Page 42

Q. I think you said that if someone is on heroin and wants to get on buprenorphine -- if I say that or Suboxone, are they interchangeable for our purposes?
A. They are.
Q. That you can't inject heroin today, and then go on buprenorphine tomorrow. There has got to be some period of drying out or withdrawal you have to go through; did I hear you correctly?
A. You heard me correctly, but tomorrow -- heroin today and buprenorphine tomorrow is okay. Because in 24 hours, if you're a heroin addict, you will be having significant withdrawal symptoms by 24 hours. What you can't do is shoot heroin this morning and take buprenorphine at noon, or be on methadone, which lasts a really long time, and take buprenorphine tomorrow. So you were close to being correct, but --
Q. I know you -- well, you said you had to have withdrawal symptoms to start on buprenorphine?
A. That's correct.
Q. Presumably that's the gist of it. It's out of the bloodstream and the body is craving more?
A. That's correct.
Q. Just for the record, methadone as a long-term treatment for heroin addiction, describe to me kind of what that is, what it's designed to do?

Page 43

A. Methadone is replacement therapy as well, except, especially in my estimation, it's much -- much less safe than Suboxone. So it is a pure opiate agonist, meaning you can overdose and die on methadone, and it is considered by the government to be the gold standard for opiate addiction.
It is very -- does not make sense to me. I mean, it is an opiate agonist, so you can think of it -- this is layman's terms, maybe, but it's essentially liquid long lasting heroin. So it is not surprising if one gives an opiate addict a whopping dose of a long lasting opiate that they buy less heroin on the street, that's not surprising, but does that do them any favors in the long term?
Q. And you can OD from it?
A. Absolutely.
Q. And you can get it from your buddy if you want more, right?
A. Absolutely.
Q. But for whatever reason currently, at least from CDC's standpoint or whoever, National Institute of Health, it's recognized as a longer term treatment than buprenorphine?

Page 44

A. They're both recognized, but it was the first one -- they had studies that showed, dating back to the '60s, that if you gave heroin addicts methadone, they used less heroin. So that became the treatment of choice.
Q. Are you aware of any correctional facilities that use methadone treatment in-house?
A. I am, especially longer-term facilities in the north. I mean, there are some state prison systems that are using it.
Q. Are you aware of any county or state jail that would have a program like that?
A. I need to make an exception for pregnant females. Essentially, the federal government has supposedly mandated that we treat pregnant females with methadone, and so jails across the country deal with that in one way or another, but the federal government mandates that. And it's a difficult thing, though, if you're, you know, in certain places where there are not methadone programs, like Mississippi. We don't have methadone programs in Mississippi.
Q. So the buprenorphine that you use at your facility, do you have to regularly get that filled and dropped off from your local pharmacy, or what's



Page 45

the supply chain on that? How does that work?
A. It is an individual prescription that comes from the -- it is an individual prescription that comes from the -- our usual pharmacy, the mail order pharmacy.
Q. Okay.
A. It is a controlled substance. It has to be handled as a controlled substance, but --
Q. So you don't have it just sitting around then?
A. No.
Q. And when it comes and it is filled, is it a week's supply, a month's supply?
A. Well, I have a 7-day and a 14-day taper, and that's all that I use at my facility.
Q. So then you're off it?
A. That's right. You asked earlier -- so I didn't -- maybe didn't completely answer your question before about when someone comes in with buprenorphine, but they're tapered off, and they do not remain at my facility.
Q. So if someone came in and said, I've been on buprenorphine for the last month, what would you do? Put them on seven day, I assume?
A. Yes.

Page 46

Q. And that taper, presumably the dose gets lower each day?
A. That's right.
Q. 14 is just a longer step-down?
A. That's right.
Q. How long have you been serving as an expert in legal cases?
A. Specifically as it relates to correctional health care, for approximately four years. I have also done a variety of other cases over the last ten or more years, but they were not in any particular -- related to emergency medicine or addiction medicine. Correctional medicine, over the last three or four years.
Q. How many cases have you been retained on as an expert in the last four years?
A. Well, you have my federal case list.
Q. Right. Which is your -- is that all cases, even the ones where you didn't give testimony?
A. No.
Q. Okay.
A. Those were the ones with sworn testimony.
Q. That's what I thought. So how many total, if you know?
A. I don't know for certain. I don't have a

Page 47

list. I would say approximately 30 to 40.
Q. If you were to characterize those 30 to 40 cases that you've been retained as an expert in the last four years, can you put them into buckets in terms of subject matter, type of case?
A. Well, they're all correctional medicine cases.
Q. Yes.
A. And, no, I don't think -- they're not -- certainly not all substance abuse related or -- they're a variety of correctional medicine cases, correctional health care cases.
Q. How many other cases have you been retained as an expert that related in some way to heroin, either overdose or withdrawal or otherwise?
A. I don't have a list. I couldn't give an exact number, but it's in the single digits.
Q. On the cases you've been retained as an expert, do you know how many were retentions on behalf of a plaintiff versus a defendant?
A. I do not know specifically, but I could give you an estimate.
Q. Go ahead.
A. Which is 30 percent plaintiff and 70 percent defense attorneys.

Page 48

Q. Have you ever turned down a case?
A. Well, certainly -- yes, certainly I've turned down cases, yes.
Q. Just because it was outside your subject matter, or you just felt you couldn't help the person?
A. Well, right.
Q. How much money do you make per year serving as an expert witness?
A. In what time frame?
Q. The last four years. Annually, when you file your tax return, you put down the amount of money you made as an expert, presumably, from 1099s. What does that total up to be?
A. Over -- the total over the last four years?
Q. Yeah, or on average per year.
A. Relatively small. So I'm having -- I'm having trouble coming up with a number. 100,000 in total, perhaps.
Q. About 25,000 a year?
A. That's what an average -- that would average over four years, I would -- yes.
Q. Do you think you make as much money serving as an expert as you do serving as the medical



director of the Lafayette Detention Facility?
A. If you --
Q. It sounds like it?
A. Yeah, okay, I believe that.
Q. You said -- I think you said that it's a relatively small number of correctional facilities, to your knowledge, that use buprenorphine as a treatment for heroin withdrawal in a correctional setting; is that true?
A. That's true.
Q. That's as we sit here today, in 2018?
A. That's true.
Q. And so would you agree with me that the standard of care with respect to correctional medicine does not include the use of buprenorphine in the correctional setting?
A. I would agree with you that the standard of care does not require it.
Q. Okay.
A. I believe it could include it, but --
Q. It would permit it, allow it as an option?
A. Certainly.
Q. And that just comes down presumably to the beliefs of the medical director or whoever is calling the shots in terms of --

A. The medical director and the facilities.
Q. I presume, obviously, that the program that you utilize at your facility is with the blessing of whatever governmental agency employs you?
A. Yes.
Q. Any distinction in terms of your treatment, whether it's related to withdrawal or otherwise, as to the federal inmates that are on loan to your facility versus the state and county inmates?
A. No.
Q. I mean, there are no federal standards or regulations or issues that impact what you do from a treatment standpoint?
A. Not that I'm aware of.
Q. Tell me about the medical -- the hospitals in your area. So if an inmate has a medical issue you can't treat, where do they go?
A. To our local -- our local hospital. It is a --
Q. What's that called?
A. Baptist Memorial Hospital.
Q. Okay.
A. North Mississippi. It's a Baptist -- Baptist Hospital is a hospital system based in Memphis, Tennessee. The hospital in Oxford is

Baptist, North Mississippi.
Q. And do you know what level of a hospital that is?
A. I think it's probably a Level 2 or -- a Level 2 or Level 3. It's not a trauma center that's staffed with a trauma surgeon 24 hours a day, but a fully capable -- fully capable referral center.
Q. Do you have -- do you work there? Do you have privileges there?
A. I do not, not at the present time.
Q. Do you have an understanding as to the level of care that is provided at Baptist Memorial Hospital in Oxford, Mississippi with respect to someone that comes in either from an overdose or withdrawal from heroin?
A. Ask the question again, please.
Q. Do you know what the capabilities are of Baptist Memorial Hospital with respect to heroin withdrawal or heroin overdose?
A. I do not.
Q. Do you know if they utilize buprenorphine in their treatment protocols?
A. I do not.
Q. So, for example, if someone is at their home in Oxford, Mississippi, and they've gone somehow

cold turkey off of heroin, or they just can't get it and they're withdrawing and getting sick, and if they went to Baptist Memorial Hospital, you don't know what treatment they would receive?
A. Not today, I do not.
Q. Do you have privileges at any hospital?
A. Not at any hospital, no.
Q. Have you ever had admitting privileges at a hospital?
A. Well, no. Emergency physicians typically don't have admitting privileges at hospitals.
Q. I didn't know if it was part of your addiction practice or centers if -- I would think there might be occasion where you would want to admit somebody to a hospital. Maybe not.
A. Well, my addiction facility is a detox -- is a detox facility staffed 24 hours a day. It is not licensed as a hospital. It's licensed as a residential detox facility. And so when we send patients to the hospital, it's normally not for detox issues, but other medical issues, and we don't admit them to the hospital.
Q. To your knowledge, have any inmates died at the Lafayette County Detention Facility since you've been medical director?



Page 53

A. Yes.
Q. Do you know how many? Can you quantify that for us?
A. I recall two.
Q. Do you recall the circumstances?
A. Yes.
Q. Just generally?
A. Suicides.
Q. Hangings?
A. Yes.
Q. Any litigation arising from that?
A. Not that I'm aware of.
Q. Have you served as an expert in connection with any jail suicide case?
A. Yes.
Q. Is it one of the ones you've testified on, you've given us in your testimonial history?
A. No, I don't believe it is.
Q. So you didn't testify in that case?
A. I've given a deposition.
Q. So it should be added?
A. Yes.
Q. Can you tell me the caption?
A. I can give you the --
Q. Court?

Page 54

A. Would you like my updated case list?
Q. Yes, that would be great. That would be great. I should have asked that at the beginning.
A. There's two copies of it.
Q. Got it. And which case?
A. It is the last one on there.
Q. Benoit versus Lincoln County?
A. That's correct.
Q. In Missouri, it looks like State Court in Missouri. Are you a plaintiff expert or defense expert?
A. I was retained by the plaintiff's attorney.
Q. Presumably your opinions are to criticize the jail staff or medical department with respect to a suicide that occurred?
A. I gave my opinion in the case regarding a suicide that occurred in the jail, yes.
Q. What was the opinion?
A. That there were breaches of the standard of care.
Q. By who, the jail physician or nurses?
A. That's correct.
Q. Specifically, what was the breach of the standard of care in that case, your opinion?

Page 55

A. Providing Doxepin, a tricyclic antidepressant, without ever seeing or examining the patient and implementing a plan to monitor the patient for suicidality.
Q. So your opinion is by prescribing an antidepressant, that one of the side effects of that in that inmate was suicidal ideation or increased suicidal ideation?
A. Well, that was part of it, but Doxepin is a particularly toxic older tricyclic antidepressant that causes death with relatively -- it has a low therapeutic index. So it doesn't take much Doxepin to overdose and die from.
Q. Oh, so that wasn't -- that's not a hanging case then. I'm sorry.
A. No, that's right.
Q. Okay.
A. It was a death by tricyclic antidepressant overdose.
Q. Got it. Do you have -- with respect to your updated testimonial history for the past four years, first of all, it looks like you've labeled it Appendix B, which would be updated Appendix B to your written report in this case?
A. That's right.

Page 56

Q. And does this contain a complete and accurate list of all cases that you've given sworn testimony either at trial, deposition, or otherwise in the last four years?
A. Yes.
Q. Are you -- without, you know, looking at notes or files, are you familiar with all these cases, if we went through them, and you could give us some information about them?
A. Most of them.
Q. Do you have --
A. Most of them. I have no notes, but most of them I could tell you at least generally something about them.
Q. Angela Anderson versus Marshall County, were you retained for the plaintiff or the defense in the case?
A. Do you mind if I get in my --
Q. Sure.
A. Let me go to my report -- let me go to my copy. Okay.
Q. Anderson versus Marshall County. You were retained as an expert in that case; is that right?
A. I was.
Q. Plaintiff or defense?



Page 57

A. Defense.
Q. And generally the allegations were what?
A. It was a -- this was a death in a jail for a civil mental health detainee. Mississippi is probably the last state in America that holds civil mental health detainees in jail.
Q. So as opposed to a psychiatric hospital or emergency psychiatric ward, like we may see here, they send them to jail?
A. That's right.
Q. So someone died in jail?
A. Someone died in jail. A mental health detainee died in jail.
Q. Died from what?
A. I don't -- I don't exactly recall. Rhabdomyolysis, I believe, was the cause of death.
Q. And what is that?
A. Breakdown of your muscles from lying immobilized.
Q. Body atrophies away, so to speak?
A. No. Your body breaks down, and the protein in your muscle clogs up your kidneys, and you die of kidney failure.
Q. And what was the plaintiff alleging in that case, that this inmate or this -- yeah, this

Page 58

mental health inmate or detainee should have gone to a hospital?
A. Basically, yes.
Q. And you supported the medical staff?
A. I was actually retained by the county in that case.
Q. So you were commenting on the correctional officers?
A. That's correct.
Q. And your opinion was that they did everything right, and there was no reason for them to send this person out?
A. That's right. They had -- the person had come from the hospital medically cleared.
Q. And the condition basically remained the same?
A. Yeah, that's right.
Q. Did you write a report in that case?
A. I did.
Q. Do you keep copies of your written reports, deposition transcripts, or trial testimony in the cases that you get involved with?
A. Not beyond the time when the cases are active.
Q. State of Mississippi versus Shawn Hunt?

Page 59

A. Yeah.
Q. What can you tell us about that one?
A. That is not a -- that is not a jail case. I can tell you -- if you want me to give you more.
Q. Just very generally, then we can probably move on.
A. Okay. It's a -- that was -- I was retained on behalf of the defendant in a criminal trial regarding a DUI toxicology -- toxic substances.
Q. Gallion versus Hinds County, plaintiff or defense expert?
A. Defense.
Q. Okay.
A. That is a jail -- that is a jail case, and actually I don't recall the underlying condition. I want to say maybe intracranial hemorrhage, I believe. It was a death in a jail, and I believe it was intracranial hemorrhage, but I don't recall for sure.
Q. Did that inmate go to the ER?
A. I believe, yes.
Q. Died?
A. I believe.
Q. And your opinion was that the event was not reasonably foreseeable, right?
A. To the best of my recollection.

Page 60

Q. Did you author a written report in that case?
A. To the best of my recollection, that was actually a sworn affidavit, as opposed to a Rule 26 report. I don't recall, to tell you the truth.
Q. I presume it was alleged in that case that inmate should have gone to the hospital sooner?
A. I don't recall.
Q. We pulled some information on you, and it suggested that your report or affidavit indicated that this inmate had a large blood clot developed undetected in the left leg, presumably through a clot, and died?
A. Yes. Not intracranial hemorrhage. Pulmonary embolus.
Q. Pulmonary embolus.
A. Pulmonary embolus.
Q. And your opinion was that that wasn't reasonably diagnosable in the jail setting?
A. You have now refreshed my recollection. It occurred at the hospital. It occurred after he went to the hospital, yes.
Q. Presumably the allegation was he should have got there sooner?
A. Yes.



Page 61

Q. You felt the medical staff acted appropriately, within the standard of care?
A. Yes.
Q. Did not proximately cause that person's death?
A. Yes.
Q. The State of Mississippi versus Dobbs versus Adams versus Tutor versus Donald. I just said those four together because they probably are criminal cases?
A. They are.
Q. Anything involve correctional health care or a jail-based incident?
A. No.
Q. You were retained in each case for the criminal defendant?
A. No.
Q. Oh.
A. Those are cases where I am a consultant in drug court, at a felony drug court, and those are cases involving the drug court -- drug court, urine drug screen testing.
Q. State of Mississippi versus Blunt. What's that, same kind of issue?
A. No.

Page 62

Q. No. Go ahead.
A. That is a criminal defendant who I treated after he was charged with a crime. I treated him afterwards, and on a pro bono basis gave a report in that case.
Q. Mississippi Board of Nursing versus Robbins?
A. There's two there. That's a husband and wife. That involves substance abuse. I was retained by them to testify in front of the Board of Nursing.
Q. Lee versus Jackson County. Is that a jail case?
A. It is.
Q. Were you a plaintiff or defense expert?
A. Defense.
Q. What do you recall about that case?
A. That case involved the death of an inmate in a county jail some number of months after they were there, and it involved a seizure.
Q. And was that inmate being treated for seizures or on antiseizure medication?
A. I don't recall. I believe at least some of the time. I don't recall.
Q. Do you recall if Mr. Lee, decedent, had a preexisting condition of seizures, which required

Page 63

medication?
A. I do.
Q. But it was your opinion that he didn't need to stay on that medication once he went into the jail setting?
A. Okay. I don't --
Q. Correct?
A. I don't recall the specifics of that.
Q. You supported the medical staff?
A. I did.
Q. Did not believe that they should have done something more to prevent Mr. Lee's seizure that ultimately led to his death; is that correct?
A. That's correct.
Q. Paylan versus Teitelbaum?
A. Yes.
Q. What is that?
A. That is not a correctional case.
Q. Just generally?
A. It is a physician who was ordered to undergo a substance abuse evaluation and is now suing the State of Florida for their substance abuse evaluation.
Q. Singleton versus Southern Health Partners, what is -- plaintiff or defense expert?

Page 64

A. Defense.
Q. And did that involve a death?
A. Yes.
Q. I note that -- okay, you don't have E/O, but that would be an estate of Singleton, presumably?
A. Yes. I think the reason that it's not E/O is that the plaintiff's name is Singleton as well, like a daughter. So I only write that when it's not -- when it's a different plaintiff name.
Q. Got it. What do you recall about that case?
A. It involved an intracranial hemorrhage.
Q. Stroke?
A. Stroke, yes.
Q. And the allegation was what?
A. To the best of my recollection, inadequate -- inadequate blood pressure treatment.
Q. Inmate had high blood pressure, was out of control, and that created an increased risk factor for stroke, that was the allegation?
A. I believe that was the allegation, yes.
Q. And you supported the medical staff?
A. That's correct.
Q. Filichia versus Correct Care Solutions?
A. Yes.



Page 65

Q. That's a Southern District of Ohio case, correct?
A. Yes.
Q. Tell us about that.
A. That is a death of an inmate in a county jail.
Q. What county; do you recall?
A. I do not.
Q. Delaware?
A. I don't recall. Sorry.
Q. Okay.
A. The inmate died. Was serving weekends in a jail, and was brought in on Friday and died on Sunday of a weekend from a -- essentially the allegation was from peritonitis or from a perforation. They had had abdominal problems -- an opiate addict who had had abdominal problems and had been -- had been to the surgeon and the ER shortly before being arrested for the weekend and in the jail for the weekend.
Q. Did Delaware County -- was it at the Delaware County Jail where that person went?
A. I just told you I don't recall.
Q. You don't know?
A. I didn't recall. It was a county jail. I

Page 66

would not -- would not promise to it being Delaware County.
Q. I think we pulled it up on the docket. It was a caption versus Delaware County Sheriff's Office. So I guess I was --
A. I'm thinking you're right then.
Q. Did that -- was there any medical staff on duty over that weekend?
A. There was a nurse who saw her when she came in, yes.
Q. What was your opinion?
A. That the care she was provided over the weekend was adequate, and her death wasn't foreseeable or preventable.
Q. Ajibade versus Wilcher?
A. Yes.
Q. What's that case about?
A. That case is a death of an inmate shortly after arrival at a jail and after an altercation. Essentially mental health -- mental health -- the issue was mental health. They got into an altercation with the booking officers and were restrained in a chair and died shortly after, sudden death in custody.
Q. Allegation was improper restraint?

Page 67

A. Well, that is part of the allegation. I'm not a use of force expert.
Q. Okay.
A. So this was also -- they had not received their receiving screening yet. They had recently -- only recently arrived at the jail.
Q. Benoit versus Lincoln County?
A. That's the one we just discussed with the overdose of Doxepin, suicide by tricyclic overdose.
Q. Oh, that's right, that's -- we started with that one.
A. Plaintiff case, that's right.
Q. Does that include all the cases you've testified in the last four years?
A. To the best of my knowledge.
Q. Let me ask you about a case, the Estate of Fatima Neal versus State of Maryland. Does that case ring a bell to you? I don't believe you have it listed.
A. Yes, it does, but, I mean, how is it not on -- hold on, let me --
Q. It's a case I think we discovered, but I didn't see it on your list.
A. Okay. You are -- you are correct. It was on my -- it was on a case list at one time and

Page 68

apparently has been deleted from there.
Q. A 2015 case. Is it still going on?
A. Yes, to the best of my knowledge. It was last year.
Q. Tell us about that case.
A. It involves an inmate in Baltimore County, I believe. To the best of my knowledge, it's Baltimore County. It involves an inmate who was there over -- HIV positive person there over a prolonged period of time, and then died with some type of intracranial event, I don't exactly recall. I want to say intracranial hemorrhage.
Q. Do you know what the allegations are?
A. Failure to -- I'm not sure it involved blood, but -- I don't think she had a history of blood pressure, but failure to treat the HIV, failure to provide medical evaluation of some variety, I don't recall exactly.
Q. Was it a sudden death type situation?
A. Yes. Intracranial hemorrhage, to the best of my recollection.
Q. Fatima Neal, was that the name of the decedent?
A. Fatima Neal.
Q. Fatima Neal?



Page 69

A. Yes.
Q. And Fatima Neal not only was HIV positive, but had a 20-year history of IV heroin use, right?
A. Okay.
Q. Does that sound right to you?
A. It does.
Q. Is that the only -- so the one heroin case, the one case with an inmate who was a heroin abuser, you didn't put on your testimonial list; is that correct?
A. It appears so. I don't -- well, I don't know. No, I believe that others of them were heroin users. The one in Ohio, that's a heroin use.
Q. That's a heroin case?
A. Yes.
Q. Filichia versus --
A. Filichia.
Q. Filichia, yes?
A. That one's a heroin case as well.
Q. And that was a case where the lady died from --
A. Peritonitis.
Q. -- peritonitis or diverticulitis, something like that?
A. Something like that.

Page 70

Q. Secondary to long-term heroin use?
A. Possibly secondary to long-term opiate use, yes, from slow motility of the bowel, yes, possibly.
Q. Basically they had a bowel burst, right?
A. She had bad diverticulitis, which had had surgery before, a few months before, and had continued to have problems, continued to go to the surgeon and such. So I don't know exactly the cause of her diverticulitis, but I'm sure it was aggravated by her long-term opiate use.
Q. And did you analyze whether or not Fatima Neal's sudden death was secondary to 20-plus years of IV heroin use?
A. I don't believe so.
Q. Do you know whether or not Fatima Neal's heart tissue was analyzed post-death during an autopsy?
A. I don't recall.
Q. Would you agree that IV heroin use is not healthy?
A. I would.
Q. That it's bad for the human body?
A. There are medical long-term effects of heroin use.

Page 71

Q. And what are they?
A. What are --
Q. What are the long-term effects of heroin use?
A. Primarily related to secondary complications of IV -- quite often IV injections. So endocarditis from unsterile injections and the sequelae of infections related to the injection more so than the heroin. There are --
Q. What you're saying is someone can use a dirty needle, for lack of a better word, get an infection in their bloodstream, can cause an infection to their heart, kill them?
A. Yes, that's correct.
Q. Do you have an opinion as to whether or not chronic, long-term heroin can cause damage to the heart muscle?
A. I don't have an opinion about that.
Q. Our expert, Dr. Balko, a forensic pathologist, has cited several studies, and I believe some of those studies are either attached to his report or referenced. Have you read those?
A. I read his report, yes.
Q. Did you read the medical studies that reflect that in case after case, when they analyze

Page 72

tissue slides of the heart muscle of long-term heroin users that died, that shows damage to the heart in a consistent pattern?
A. I did not see studies attached to his report.
Q. Are you aware of any study or any medical literature that would suggest that long-term use of heroin can cause damage to the heart?
A. I do believe there are such studies, yes.
Q. And do you agree or have knowledge that the damage that can be caused by long-term heroin use can be seen from tissue slides?
A. I don't have expertise about that or an opinion about that.
Q. You would defer to someone with training in that area; would you not?
A. I'm not an expert in cardiac tissue pathology.
Q. Would it surprise you that long-term heroin use would cause damage to the heart?
A. I believe there are effects to a number of organs long term from heroin use.
Q. Does long-term use of heroin reduce one's life expectancy?
A. It does.



Page 73

Q. Is there a certain quantifier you can put on that?
A. No, I cannot quantify it.
Q. If you were treating someone who was a heroin addict, I presume you would tell them, if you keep this up, you're not likely to live to be an old -- to live into your elderly years, into your 80s and 90s?
A. They're certainly at a much higher risk of death than someone who does not use IV heroin.
MR. BYRD: Yeah, I'm going to object to that general statement. Move to strike.
BY MR. HOJNOSKI:
Q. What do you -- what can you tell us or what do you know about Martie Clark's preexisting conditions or her health prior to coming to the Hamilton County Justice Center in August of 2014?
A. Do you mind if I turn to my report?
Q. Yeah.
A. I know that she reported a history of IV heroin use for a number of years, and I get that information from her prior Hamilton County Jail records. So I don't know a specific number of years.
I know that she reported to the Hamilton County Jail staff that she had had a heart attack in

Page 74

2007, and that she reported that she had bipolar disorder. And I reviewed her records from the two hospitals, the -- there's two hospital records, I think University of Cincinnati and perhaps Mercy West, that I reviewed.
Q. Did you identify in your report everything that you reviewed?
A. I believe so, but let me -- let me just tell you what I'm -- to which I'm referring. University of Cincinnati Medical Center and Mercy West Hospital records.
Q. I'm just trying to get to the right part in here.
A. Page 20.
Q. There it is, yes. Do you know what years of treatment you reviewed from University of Cincinnati and Mercy West?
A. I have them here.
Q. Yeah. Go ahead.
A. I mean, and I may not be able to tell you the years that they reflect just from -- I have the University of Cincinnati, which -- I've got a '14, and just at quick glance, I see 2010 and later, but I can't -- I mean, I'd be glad to try to figure out --
Q. I just didn't recall anything in your

Page 75

report where you said, according to her UC Medical Center records, she had a history of XYZ?
A. You asked me what I had reviewed. I said I had reviewed her medical records. She went to the emergency department a few times.
Q. Do you recall gaining anything by way of her medical history from those hospital records?
A. I recall reviewing that she did not have significant medical problems reported in those conditions. I mean, there was -- there were discrete emergency department visits for discrete events that do not appear to be part of an ongoing pattern or process.
So there was a car wreck, a strain of a back, a scalp laceration, et cetera, so there were individual emergency department events. And to the best of my recollection, there was not a lot reported about past medical history; so her past medical history was essentially negative, except for those discrete emergency department events.
Q. Did Martie Clark have a family physician, to your knowledge?
A. I don't -- I do not know.
Q. Did she get annual physicals, to your knowledge?

Page 76

A. I do not know.
Q. Did she have health insurance?
A. I do not know.
Q. Did she -- was she on any medications?
A. I believe she reported she was not at the time of her admission to the Hamilton County Justice Center.
Q. Do you know if she was supposed to be on any medications?
A. I do not. I believe she reported she was not.
Q. Do you know if she had previously been on any type of methadone or Suboxone treatments?
A. I believe that there was a mention in a prior jail record about her taking Suboxone. So I -- but I don't have any records about the specifics of that. I saw a mention of Suboxone in a prior jail record.
Q. Right. I'm thinking 2012, when she came in, she was -- she reported a history of being clean for a few weeks and on Suboxone; do you recall that?
A. I believe that is correct, yes.
Q. Do you know who prescribed her Suboxone?
A. I do not.
Q. Did you inquire from Mr. Byrd or from



Page 77

anyone else as to any prior treatment she would have received for heroin addiction or heroin withdrawal?
A. I did ask for what medical records they had available.
Q. Did you see any records with respect that -- see any medical record at all that reflected what Martie Clark, how she -- how she reacted to withdrawal of heroin in the past?
A. I'm sorry. Ask the question again, please.
Q. Are you aware of any medical record that exists that would reflect how Martie Clark reacted to withdrawal of heroin?
A. I saw in the Hamilton County Justice Center records where she had previously been treated for heroin withdrawal.
Q. Anything outside of the Hamilton County Justice Center?
A. Not that I recall.
Q. Have you treated individuals who have had multiple relapses of heroin use, and then they detox, and then, you know, it's kind of a roller coaster ride, so to speak?
A. Your question is, have I treated patients who have been treated and have relapsed? I'm sorry.

Page 78

Q. Yes, have gone up and down. Where they're on heroin, and then they're off heroin, then they're on heroin, then they're off heroin?
A. I've treated patients before who have relapsed, yes.
Q. And have you -- in those situations, is the detox or the withdrawal the same every time or is it different?
A. It's different. Quite often, it becomes more severe.
Q. Do you know how many times Martie Clark had detoxed from heroin in the past?
A. I do not.
Q. As we sit here today, do you have -- are you basing your review in this case on a certain number of years or dosage or regularity that Martie Clark used heroin?
A. Yes. I'm sorry, you said do I have an understanding about what amount of heroin that she used?
Q. Yeah.
A. I believe that she reported around a gram a day.
Q. And is that what you're -- is that -- as you reviewed this case, are you taking that at face

Page 79

value?
A. Well, that was part of the record and that was part of the information that I considered, yes.
Q. So you accepted that when it was put in the records, that she told a nurse, I've used heroin for several years and take about a gram a day?
A. Gram a day, yes. Well, I need to it -- I need to see what her exact language was. I took at face value what her comment was or what her -- what her answer was to the intake nurse, and it was -- I'm going to be there in just a moment.
On her receiving screening, I have heroin last -- and then last use today, or the day of admission, and I don't see a quantification there. I believe that I recall the quantification of approximately a gram a day somewhere else. I don't see it right at this point.
Q. The record you're referring to right now is her receiving screening on August 1 of '14?
A. That's correct.
Q. Because she had prior receiving screenings on prior incarcerations at the jail; did she not?
A. Yes. None in the approximately seven months. So it had been at least seven months since her last incarceration.

Page 80

Q. When she reported to nursing staff at the jail that she had a prior MI or heart attack, did you accept that as part of her medical history?
A. I accepted that she said that, yes.
Q. Just like she said, I'm a chronic heroin user?
A. Yes. Well, there was -- there were needle marks on her arm. There were needle marks on her arm. I didn't -- so I didn't doubt or -- I accepted that she told them that, it was part of her screening. In other words, there was -- there was other things that would indicate that she was a heroin user, such that there was needle marks. I did not see any records of when she was treated for an MI in any of her prior medical history, or any other mention that she had had an MI in those -- in those hospital records.
Q. Would you agree that that is an unlikely piece of medical history for someone just to make up?
A. No, I don't know why -- I mean, I don't --
Q. For example, I mean, you know, I'm sure you've seen inmates over the years that make up a prior medical condition or feign symptoms to try to get certain treatment. Is there any reason why an



inmate would say, I had a heart attack eight years ago? I mean, that doesn't -- is there any motivation for an inmate to lie about that?
MR. BYRD: Objection. You can go ahead and answer.
BY MR. HOJNOSKI:
Q. Can you think of a reason why an inmate would be untruthful about having a prior heart attack?
A. I don't have any information about that.
Q. Did you also note a prior history of addiction or abuse of any other drugs in Martie Clark's past?
A. Certainly not at the time of this admission to -- at this admission.
Q. On prior admissions?
A. Nothing with any consistency. It is -- I believe there may have been a mention of benzodiazepines at one point on one admission, one prior admission, but I did not see any other -- I didn't see any other reference to this.
Q. Do you recall a mention that she did Percocet before she went on heroin?
A. Yes. I'm sorry, I -- I, perhaps, made too much of a jump. So heroin is an opiate. Most people

who are heroin addicts began with -- began to at least use prescription opiates sometime along the way. So that would be a -- I presumed that as part of my -- I'm sorry, that was a presumption.
Q. Get someone hooked on it?
A. That's right. I mean, that was --
Q. But then prior to that, you believe there was also an issue with benzo?
A. I didn't say there was an issue.
Q. Oh.
A. No, I didn't say there was an issue. I thought I saw a reference once to benzo, one time in the record, which I don't consider to be an issue if -- only once in a long record.
Q. Marijuana use, alcohol use, did you see any reference to that?
A. I did not see anything that would, as you just said, would raise to the level of an issue, I didn't see. I'm not going to say there was no mention of it in there at all, but certainly not that would appear to me to be an abuse or dependence issue.
Q. Martie Clark was a smoker?
A. She was.
Q. Pack a day, I think, is what's

referenced --
A. I don't know.
Q. -- if my memory serves me.
A. I'd be glad to look, but I don't know for sure.
Q. Is cigarette smoking good or bad for someone that has a history of heart disease?
A. I think it's pretty widely accepted in the medical community these days that smoking is not good for anyone, whether they have had a history of smoking or not -- I mean, a history of heart disease or not.
Q. Have you had any patients, either in private practice or in a correctional setting, that have had a heart attack?
A. Certainly.
Q. Have you had any patients who have died from some sudden cardiac event?
A. Have I ever, in my career, had a patient who has died?
Q. Yes.
A. Absolutely.
Q. And has that happened a lot?
A. Fortunately not a lot, but, I mean --
Q. Heart disease is one of the leading causes

of death in this country; is it not?
A. It is.
Q. And the experiences that you have had, has it been from a myocardial infarction or from sudden cardiac arrest or from some other type of arrhythmic event?
A. I've never done a study on -- I can't tell you what the cause of their sudden cardiac --
Q. Do you understand the difference between a sudden cardiac arrest and an MI, or what otherwise is referred to as a heart attack?
A. Absolutely.
Q. And what do you understand the difference to be?
A. Well, an MI is when -- so there are coronary arteries which feed the blood supply to the heart muscle. There's three main ones. When one of those arteries becomes blocked, either by a narrowing of that artery or by some combination of narrowing and then a blood clot to go in there, and the artery is blocked, that creates a heart attack, an MI. That causes a couple of things.
Number one, the tissues downstream from that die, and that's what a myocardial infarction is, is a dying of tissue downstream to where that



Page 85

blockage is. In conjunction with that dying heart muscle, that heart muscle becomes more irritable, if you will, and you can die of an arrhythmia in that setting.
So in conjunction with a heart attack, a myocardial infarction, there's a blockage to an artery. There's death of tissue downstream, and you can die of an arrhythmia. Sudden cardiac death could or could not occur in conjunction with a myocardial infarction. When it doesn't occur in conjunction with a myocardial infarction, it often occurs in the setting of only narrowing of the arteries and not a -- not a heart attack, so not death of tissues, but the narrowing of the arteries.
Q. Are you aware that individuals can have sudden cardiac death due to sudden cardiac arrest and have no narrowing, no blockage, or no signs of any type of an infarct?
A. I believe that -- I believe that that can occur. I believe it's much less likely than in individuals who have narrowing of their coronary artery disease.
Q. Doctor, isn't that the reason that we have defibrillators in schools, airports, airplanes, gymnasiums, because people can have sudden electrical

Page 86

disturbances in their heart, and unless there's a shock that is given in a short period of time, that they die?
A. Yes.
Q. That's in the absence of any type of narrowing of the blood vessels or heart vessels or an infarct of one of those major arteries, isn't that true?
A. I'm not a cardiologist, and I don't have the -- I don't know the statistics, but I believe that it occurs much more likely -- it's much more likely to occur if you have narrowing, and much less likely to occur in the absence of narrowing.
Q. Do you know what other type of cardiac arrhythmias an individual can have that can lead to sudden death?
A. Yes. There are a number of congenital -- I mean, there are a number of arrhythmias that can cause sudden cardiac death. So a number of arrhythmias which arrive -- which arise from different parts of the heart, some from the top part of the heart, some from the bottom of the -- part of the heart, but it can -- there are a number of rhythm disturbances which can occur and which you can die from, yes.

Page 87

Q. Accepting the medical history that Martie Clark gave at the jail on one or more occasions, that she had a prior heart attack in 2007, that would suggest, would it not, that she had what she interpreted as a heart attack, taking her words at face value, at the age of approximately 30 to 31 years old?
A. That is what she --
MR. BYRD: Objection. Go ahead.
THE WITNESS: That is what she said, yes.
BY MR. HOJNOSKI:
Q. And someone at that young age who has a heart condition, does that suggest perhaps some type of congenital defect or other type of abuse to the body?
MR. BYRD: Objection.
THE WITNESS: No, I don't have an opinion about that.
BY MR. HOJNOSKI:
Q. Do you know if Martie Clark had any prior overdoses?
MR. BYRD: Objection. I don't think it has been established she had an overdose.
MR. HOJNOSKI: I don't know if it has either. I'm asking this expert if he knows one

Page 88

way or the other.
THE WITNESS: I'm not aware of any instances.
BY MR. HOJNOSKI:
Q. Tell me when you were first retained in this case and how you were retained.
A. I was retained -- I was retained approximately in November, I want to say. I could be wrong on the month, but a few months ago, in the -- in the fall.
Q. Your report is dated -- it's not dated.
A. My report -- do you want to see -- what day is it filed? What day is it?
Q. Well, this is the day it was filed in the court. It was filed on November 15th, I believe served to us on that same day.
A. Okay.
Q. Do you know when your report was drafted and finalized?
A. It was finalized -- it was finalized shortly before -- on that day or shortly before, and I was retained -- I don't recall exactly, but a few weeks prior to that.
Q. Were you retained by e-mail, by phone, by letter, if you know?



Page 89

A. I'm certain that I had a phone conversation with Mr. Byrd. I don't recall if -- initially if I was e-mailed or if I was called, I don't recall what was the initial contact.
Q. When you're retained as an expert, do you always know the outcome before you start your review?
A. Absolutely not.
Q. I don't mean the outcome of the case, I mean the outcome of an individual.
A. Oh, I'm sorry, say this again.
Q. When you review a medical case, and you're assessed presumably in almost every circumstance in a medical case to look at the care and treatment that was provided by the medical staff, correct?
A. Right.
Q. And when you are doing that review, do you typically know the outcome of that patient?
A. Well, in this case specifically, but in cases in general, I typically would know that the person died. I typically would review the jail records prior to knowing what the autopsy results are, if that's what you're referring to. So in this case -- which is what I did in this case, so I knew that the person had died. I knew Ms. Clark had died.
Q. So as you are going through -- and that

Page 90

was just simply going to be my question. When you're going through the information, you knew that this inmate or that this patient, this individual, Martie Clark, had passed away?
A. I did.
Q. And do you think that colors your view of the facts as you go through them?
A. I do not believe it does.
Q. Backing up for a minute. The cases that we went through from your testimonial list, and then the one additional one, the Neal case that we discovered, those all seem to be defense expert cases, all the medical cases?
A. No. The one that we discussed --
Q. The last case, the last --
A. I think so.
Q. You said before it was roughly 30/70?
A. That's right.
Q. Is it to say that you're more often deposed or give sworn testimony in the defense cases?
A. Well, that's what it appears from that case list, but that's -- that's not the reality probably.
Q. Just in the last four years, that's the way it has played out?

Page 91

A. Well, perhaps -- I'm typically contacted by plaintiff's attorneys earlier in the -- I mean, earlier in the process, before -- I mean, so there's potentially 18 months worth of time that's going to pass by before there's going to be any report required or anything like that.
Q. And usually when you're probably retained by a defense lawyer, there, you know --
A. There's an upcoming deadline.
Q. -- 30 days, or, yeah, I've got to get a report out?
A. There's a deadline coming.
Q. All right. Have you ever had a patient die from heroin withdrawal?
A. No.
Q. You paused for a minute. Just thinking, or was there a case that was close, or --
A. Well, no. So I've worked in emergency departments. I've had a -- I have a 175 bed drug and alcohol treatment facility that we've never had a -- we did not have a death in our facility.
I did send people out -- we sometimes send people out who die of withdrawal, I mean -- or not necessarily of withdrawal, but as a for instance, an alcoholic with severe liver disease who winds up

Page 92

going to the hospital. And I was trying to recall if I had sent someone out who had had heroin and was being treated for heroin withdrawal and died at the hospital of something, and -- but I don't -- not that I can recall.
Q. Presumably those that come to your treatment facility addicted to heroin or other opioids, when they leave, they're not actively withdrawing?
A. That would be the goal.
Q. And if they leave on buprenorphine, they would -- they likely wouldn't be withdrawing because they're still getting some daily amount of opioid; is that correct?
A. Yes, but I don't -- yes, but we have an absence-based treatment program; so I don't discharge people.
Q. So you do the tapering system the same in your facility?
A. That's correct.
Q. What's the average length of stay inpatient?
A. Well, our regular adult program is 30 days. Our young adult program, 45 days.
Q. And then do you do outpatient programs as



Page 93

well?
A. That's right.
Q. What --
A. Sober Living and Intensive Outpatient.
Q. So that's psychotherapy counseling, it's not methadone or Suboxone?
A. Typically. I mean, we are an absence-based program. I don't mean to imply that we have never used buprenorphine or that I haven't -- I have never used methadone. You have to be a federally regulated methadone clinic.
Q. Okay.
A. I have, on occasion, in conjunction with patients and families, decided that buprenorphine was a -- what we call a harm reduction model. So in other words, a person has almost died four times of a heroin overdose.
In a three-month period, it might be safer to leave them on buprenorphine for the next year or two, because it's just too dangerous, have too high of a risk of overdose. So we do use it, but it is not our standard treatment modality.
Q. Have you had patients that have died from heroin overdose, like they've relapsed or --
A. Not -- certainly, absolutely, I've had

Page 94

patients who I have treated before who have gotten out of our facility and died of a heroin overdose, yes.
Q. Right.
A. Never -- I have never had an overdose in one of my facilities.
Q. While they're doing an inpatient program or something like that?
A. That's right.
Q. What about someone that's continuing to get outpatient therapy or counseling, has anyone relapsed and died as a part of that process or while going through that process?
A. Not that I'm aware of. I believe we may have had somebody, like, walk off from our Sober Living and died, I mean, you know, within a few days, but I don't consider them actually in our program.
Q. Have you ever had a patient die from dehydration?
A. Not that I'm aware of.
Q. Have you ever had a patient die from malnourishment?
A. Not that I'm aware of.
Q. Do you know how long it takes someone to become malnourished?

Page 95

A. If -- I do not know a specific -- you're talking about malnourishment, as opposed to dehydration?
Q. Yes.
A. No, I don't know. It is on the order of certainly weeks.
Q. Do you know what comes first with someone who is not getting food and water, dehydration or malnourishment?
A. Dehydration is a much -- is a much faster process than malnourishment.
Q. How long does it take for someone to become dehydrated, if there is a general rule?
A. I don't think that there is a general rule, because there are two parts to dehydration, input -- input and output. Therefore, a person who has substantial output, such as vomiting and diarrhea, would become dehydrated much faster than someone who was just not drinking water. So it would all depend on what the losses were in addition to the intake.
Q. Have you treated patients that have become dehydrated?
A. Certainly. I have treated patients who were becoming dehydrated or were already dehydrated,

Page 96

yes, I have.
Q. And typically if someone is unable to keep fluids down, are they unable to keep solid foods down as well?
A. Typically if a person is not able to keep even liquids down, they would not be able to keep foods down also, that is correct.
Q. What are the signs of dehydration?
A. Those are pretty variable, depending on the -- what age of the patients you're talking about, a child, an elderly person, an adult -- a middle range adult. And so those all depend and depend on the severity of dehydration. So there are things that one can look for. They may or may not be present in individual cases.
Q. By and large, a physician or nurse diagnoses a patient with being dehydrated from physical assessment, correct?
A. Physical assessment and lab assessment.
Q. But in the absence of, you know, immediate lab results, you typically talk to the person, ask them questions, assess what their skin color is, take other information in terms of maybe the color of their urine, how much they're drinking, those types of things, correct?



Page 97

A. Those are all a part -- important parts of the history, yes.
Q. When Martie Clark came into the Justice Center on August 1st, do you know what her nutritional levels were at that point time? Do you know if she had been regularly eating and drinking fluids?
A. I believe with regards to her nutritional level, I believe we have a -- I believe that her vital sign thing says what her body mass index is, which would give some indication of her weight and her height.
Q. Right.
A. And let me try and see if I can turn to where that is. But I did -- I did not see in the receiving screening other comment, I don't believe, about her nutritional status overall, although I -- except to the extent that I saw her described as thin.
Q. What was her height and weight?
A. I'm working on it. Height was five feet, nine inches, weight 150 pounds, and a body mass index of 22, which is within the normal range.
Q. So she wasn't -- she wasn't thin? I mean, she was just normal height and weight?

Page 98

A. I don't have a little chart in front of me, but five feet, nine inches, 150 pounds, and a BMI of 22, to the best of my knowledge, best of my recollection, is normal height and weight. So it's -- she's tall for a female, I believe that's higher than -- I mean, taller than your average female, but -- I believe, I can't say for sure.
Q. As part of your report, it appears as though that you're of the belief that she was not keeping anything down during her incarceration; is that right?
A. I believe she had significant vomiting and diarrhea during her incarceration, yes.
Q. How many pounds did she lose?
A. Let's go to her -- I want to say her weight was 136 upon her -- just a moment. Let me see what she weighed on -- at the autopsy. 131.5. So if you were presuming that both of those numbers were correct, that would be 18.5 pounds.
Q. Do you know if she estimated her weight, or if she was weighed when she came to the Justice Center?
A. I do not know.
Q. And that's why you said assuming those things are accurate numbers, correct, because she was

Page 99

weighed upon autopsy?
A. Right. And -- well, not only that, but they're different scales. She wasn't weighed on the autopsy scale. They weren't necessarily calibrated to each other, even if she was weighed.
Q. Did you review any photographs of Martie Clark either in her jail cell or as part of the autopsy?
A. I did.
Q. And did you have any opinions based on your review of those photos in terms of what her body looked like, in terms of body mass -- what we're talking about now?
A. She appeared to be thin to me.
Q. Thin, okay. Do you know historically what her weight was?
A. I do not. I'm sorry, that page I was just on with the vital signs has historical numbers on it from prior incarcerations; so I do know. I mean, I want to say that I saw 150 down through there, similar numbers. I'm sorry, I -- let me find it, and I bet I can tell you, but -- so, yes, I do know something about her historical weight was in the 150 range.
Q. Do you have any information about her

Page 100

input of liquids or food while she was at the jail?
A. To the best of my knowledge, it wasn't recorded. So we don't have that.
Q. Based on your review, did you see anything that related to, you know, mealtime, when she was at the jail, whether she was eating her breakfast, lunch, and dinner, or not?
A. I did not.
Q. Did you see anything that reflected the amount of liquids that she was consuming?
A. I didn't see where that was recorded.
Q. Did you see a reference from any of the correction officers or medical staff in terms of what she was drinking or if she was able to keep down food or liquids over those days?
A. I did not -- certainly not on any serial basis. I believe I saw one or two reference -- or at least one reference, I recall, you know, given fluid or something like that, but that is a statement about being provided fluid, not about intake. So I don't -- I did not see a reference to -- I'm not going to say there's not an individual reference in there, in the record somewhere, but certainly there's no serial record and there's no quantitation.
Q. Certainly it's not the norm, or I'm sure



you don't do it in your facility, to measure input/output of fluids of an inmate at a county jail?
A. It certainly can be done. I believe that what is the standard is some measure of the person's taking in amount of fluid. So the output is a much more difficult number to measure, but I do expect my nurses, and I would expect nurses in general, to make a quantitation of the amount of fluids that a person was taking, or at the very least, the amount that was provided, electrolyte -- and what type of product that was, electrolyte replacement solution or other such.
Q. Is there certain protocols that you utilize at your facility with respect to giving fluids to inmates?
A. There is not in writing, but we do have certain procedures that we follow, such as the provision of ad-lib, meaning we keep a -- meaning we keep a pitcher of replacement solution or an availability of Gatorade or Powerade, one of the electrolyte replacement solutions, and keep that filled on a regular basis.
Q. What are the signs or symptoms that someone, you know, needs more fluids, needs some electrolytes?

A. Well, the most important sign is that they're having losses of those fluids. So in other words, they're having vomiting and diarrhea by the -- by having losses of fluids via vomiting, diarrhea, insensate losses, meaning sweating, and the more that a person is doing of those things, the more they are likely they would need fluids, need replacement of them. I'm not -- I can't remember now exactly what your question was.
Q. Just what the signs and symptoms were that someone is either becoming dehydrated or needs more fluids. What do you look for?
A. Okay. So as I told you, that, I guess, was the first part of that.
Q. Are you vomiting, or are you having diarrhea?
A. The amount of -- the amount of loss, or are you sweating?
Q. Or sweating.
A. Sweating profusely.
Q. Right.
A. Then, in addition to that, physical signs on physical examination, such as the status of the mucus membranes, whether the membranes are dry, status of the skin, whether there's tenting of the

skin. Then there are later signs, capillary refill signs, vital signs, change signs, those are later signs that come along, but all of them would likewise come along.
Q. Color of urine, is that a sign of dehydration?
A. Not in and of itself. It is a sign of the concentration of one's urine, but one can have concentrated urine and not be dehydrated.
Q. Okay.
A. Or on the other hand, one can be unable to concentrate the urine and be -- urinating too diluted urine and becoming dehydrated with diluted urine; so it's not necessary.
Q. Anything in the record that you saw that suggested that Martie Clark was profusely sweating or perspiring a lot during her incarceration?
A. It would be one of the normal signs and symptoms of opiate or heroin withdrawal. And I don't recall that it is one of the items that is -- I don't recall it being on the detox assessment forms.
Q. As a box to check or something?
A. That's right. And I don't remember it being described in the text. There was -- on the day of her death, there was -- there was mention about

her clothes being wet, but I don't know that that was related to sweating or what it was related to.
Q. Okay.
THE WITNESS: May I ask that we take a break?
MR. HOJNOSKI: Yes. And I should have -- I usually try to do that every hour-and-a-half or so. So we've been going two hours almost. Go off the record.
(A recess was taken from 3:37 to 3:45.)
MR. HOJNOSKI: Back on the record.
BY MR. HOJNOSKI:
Q. Doctor, I just want to make sure that I know everything that you have looked at and reviewed up until this point in time. Feel free to direct me to your report, and if there's anything in addition, please just let me know.
A. Okay. If you will turn to page 20 in my report, I have a couple of comments about a couple of those items. With regards to the investigative report, I reviewed -- I believe that would be an Internal Affairs investigation report. I have not reviewed any NaphCare quality assurance QI process.
This -- you're welcome to look at what I have reviewed in the way of an investigative report.



Page 105

I have since this received and reviewed a -- I believe it's a county -- a county expert report, I can tell you, which is not on this list right here. I can tell you the name of that first. I believe it was Kay Wild, W-i-l-d.

There was also a county listing of the medical examiner, but the report was really just the autopsy report, which is in here. And I believe that is the only additional document beyond what is here.

And I need to make a correction in that the NaphCare policies and procedures for Hamilton County, I requested -- I mean, I wanted them, and I did not -- all I have reviewed is the intoxication withdrawal and detoxification protocol. I have not reviewed other -- that's an error. I did not review the entire policies and procedures.

Q. You were -- is that it?

A. To the best of my knowledge, that's -- I haven't received any additional records.

Q. You were disclosed and identified as a rebuttal plaintiffs' expert. It's not entirely clear to me what you're rebutting, but if you have a sense of that, maybe you could tell us.

A. I don't have any information, other than the -- other than the -- to comment on the reports of

Page 106

the other -- I'm sorry, of the NaphCare disclosed defendants.

Q. Have you spoken or communicated in any way with Dr. Santoro or Dr. Laposata, who are also identified as experts for the plaintiff in this case?

A. I have not.

Q. You've read their reports and that's it?

A. That's correct.

Q. Have you ever interacted with them on any other cases?

A. Not to the best of my knowledge.

Q. You are certainly not, to your knowledge, retained or being proffered as an expert in rebuttal to Dr. Balko, our pathology expert? That wouldn't be something you would be rebutting, because you're not a pathologist, correct?

A. Well, I was not specifically -- you are correct, I am not a pathologist. I -- certainly to the extent that he opines about care within the jail and/or the cause of death, I certainly -- I mean, I certainly offered an opinion about and believe I'm qualified to give an opinion about the cause of death as it -- or comment upon the autopsy report and the cause and circumstances of her death.

Q. In terms of the pathological findings that

Page 107

Dr. Balko made based, in part, on his review of I think recut tissue slides, you don't, I presume, have -- you haven't seen the slides, you -- that's outside of your area of expertise?

A. I was not retained for that purpose and have no opinion about that. I was not asked nor would I -- would I form an opinion about that.

Q. And to the extent that Dr. Balko's opinions are supported in part by any medical literature, that's not literature you looked at or -- and, therefore, are not in a position to comment on one way or the other as we sit here today?

A. You're talking about tissue pathology?

Q. Yes.

A. As opposed to clinical care?

Q. Yes.

A. No, I have not reviewed the literature and am not familiar with nor an expert in that area.

Q. You would concede, I assume, that a forensic pathologist is in a better position to determine cause of death than you are?

MR. BYRD: Objection.

THE WITNESS: No, I would not concede that.

BY MR. HOJNOSKI:

Page 108

Q. Tell me why. Isn't that what that field of specialty is dedicated to 100 percent?

A. The reason that I would say that I am -- that a forensic pathologist is not necessarily in a better position to know the cause of death is that they may or may not have the clinical information about what actually happened to the person. So they are -- you know, they have performed an autopsy. They have determined pathologic findings, but a clinical person or an emergency physician or -- specifically in my case -- might be in a better position to know about the clinical circumstances surrounding a -- so -- about the clinical circumstances surrounding a death.

Q. When is the last time you worked in an emergency room?

A. I -- I presume you are quantifying that to mean an emergency room specifically, as opposed to an Urgent Care or some other type of -- other type of --

Q. Yeah, that's correct. That's correct.

A. Okay. More than ten years.

Q. Have you worked in Urgent Care facilities?

A. Yes.

Q. More recently?



Page 109

A. Yes.
Q. How do you distinguish Urgent Care from emergency room? We all know they're not -- they don't have quite the level of care, but --
A. Well, in Mississippi, we don't have freestanding emergency departments. So the easiest way is it's not -- it's not a hospital building.
Q. Right.
A. I mean, that --
Q. Right, okay. I want to go back to just signs and symptoms of dehydration. What I primarily heard from you to this point is that the primary signs or symptoms relate to one's ability to -- well, relate to one's history of losing fluids, either through diarrhea, vomiting, or profuse sweating or perspiration?
A. That would be the -- that would be the outlet portion of dehydration, yes.
Q. In terms of physical signs of dehydration, can you go over those with me? You've touched on it a little bit, but to the extent you have not included something?
A. Dry membranes, sunken eyes, or -- I'm not certain that I -- that -- I am not certain how reliable that sign is, but it is often -- sunken

Page 110

eyes, dry membranes, skin tenting. Then as you go -- as you go further along, capillary refill being slowed, mentation being slowed. So in other words, someone's thought or mental status are not normal, abnormal vital signs.
Q. Specifically?
A. Specifically the -- normally the first change that one sees normally would be an increase in elevated heart rate that occurs before, you know. Later signs is a drop in the blood pressure.
Q. And what would qualify as elevated heart rate?
A. The typical -- the typical range of pulse that is considered normal in an adult, and we're speaking only of adults here, because children have entirely different ranges, but typically is 60 to 100.
Q. And what would qualify as a below, lower than normal blood pressure?
A. Well, the typical number that would be -- one would see in the literature would be the top number, the systolic number of 90 or so, 90 -- less than 90, 90 or less.
Q. Okay.
A. But certainly there are other changes that

Page 111

are more subtle, such as narrowing of the pulse pressure, which is the two numbers becoming closer together first.
Q. When someone is detoxing from opioids, I think you said earlier that -- I said, is that like the flu? And I think you said really bad flu or worse than the flu is I think how you described it.
A. A bad case of it.
Q. Bad case of the flu. So what do you expect to see signs and symptom wise of someone who's detoxing from opioids? I've had children and I've had the flu, we've all had the flu. I mean, we look pretty sick, right?
A. So, first of all, this is a -- I don't mean to sound like a school teacher or mince words, but I like to use the term "withdrawing." So detoxing -- I mean, detoxing is you're undergoing a process of treatment for withdrawal. Withdrawal is the more correct symptom.
Q. Okay.
A. So someone who is withdrawing from heroin, what we mentioned -- I mentioned a list of symptoms before that one would expect, vomiting, diarrhea, sweating, runny nose, runny eyes, muscle aches, bone aches. So I would expect those, and then I maybe

Page 112

missed out on the rest of your question, was what symptoms would you expect to see, so those.
Q. Well, you said, I think, if we're clear, withdrawal from opioids is like a bad case of the flu?
A. That's right.
Q. You agree on that. And so, therefore, what you would expect to see in someone who was withdrawing from opioids is flu-like symptoms?
A. Right.
Q. Tired, malaise, body aches, vomiting, diarrhea?
A. Correct.
Q. Low energy?
A. Correct. All of those things.
Q. Temperature?
A. You would not expect to see a change in temperature, no.
Q. Any abnormal vital signs when one has flu-like symptoms or withdrawal symptoms?
A. You -- so it would not be abnormal to see -- would not necessarily be abnormal, I should say, to see an elevated heart rate, even in the absence of dehydration. It would not be out of the realm of possibility to have an elevated heart rate



Page 113

and/or the possibly of elevated blood pressure as a result of the withdrawal itself.
Q. That's with -- that's true with withdrawal of most drugs; is it not?
A. In general.
Q. Alcohol or something?
A. A stressful situation, yes.
Q. Dr. Laposata, one of the experts retained by the plaintiff, in her report indicated that she believed that Martie Clark had stress put on her heart. Do you recall reading that?
A. I recall -- I vaguely recall that. I don't have -- I can't turn to it specifically. I was turning to her report. If you would like to direct me to a particular area, I'd be glad to look at it.
Q. I'll pull it up on my computer in a minute, but I just wanted to simply ask that as a formation of my question of does withdrawal from opioids put stress on the heart, just the fact of the body withdrawing?
A. I don't know that I would call it stress on the heart. It is a physiologic -- withdrawal is a physiologic stressor, yes, on the body in general. So, I mean, the heart is one of the organs in the body that is undergoing a physiologic stress during

Page 114

withdrawal, yes.
Q. I think we have covered the fact that as the record is today, you don't have any information one way or the other in terms of what type of food Martie Clark was eating during her days of incarceration?
A. I don't recall any specific note regarding her food intake, or that it was recorded, or that it was recorded by anyone. And I did not see any, if such exists, correctional officer logs, because sometimes there are correctional officer logs in a facility regarding a person's intake, or whether the person ate food or not, and I did not see any in this case.
Q. Do you have any information from her family or friends or anything that maybe had phone contact with her during her days of incarceration?
A. I don't have information about that except to the extent that there -- it was my understanding from the investigative report, I believe, that there was a visitor which came to see Ms. Clark around the time of her death.
Q. But there wasn't -- did that visit occur, to your knowledge?
A. To my knowledge, it did not.

Page 115

Q. Do you have any information that Martie Clark's membranes or skin were dry during her days of incarceration?
A. To the best of my recollection, that was not included in the assessment forms that were filled out, and I did not see that the nurses made comment on that one way or another in their -- in their free-text notes, aside from that.
Q. To the extent that the Justice Center records, NaphCare records, would reflect observations that her skin was warm and moist, would you take issue with that?
A. If you could point me to where that -- or perhaps I could turn to that section and see.
Q. And I'm happy to do that, it's just we can -- the records are going to be what the records are.
A. Well, I would -- what I would say about that is if that is notated at one particular point in time, it is a -- it is a point in time, and I wouldn't take issue with that at that point in time, but I would not say that that generalizes to other points in time.
Q. To go back to my first question, do you have any information from the record that her skin

Page 116

was dry?
A. I don't recall seeing that -- I do not recall seeing that entered in her records.
Q. Any indication that her membranes were dry? And why don't you clarify what you mean by membranes.
A. So the skin is pretty obvious, it's the skin on the outside of your body. The membranes are most commonly inside of your mouth. So the mucosa on the inside of your -- one's mouth.
Q. Dry lips?
A. That's the most easy -- that's the easiest membrane to observe.
Q. Would you get dry -- expect dry hair?
A. No, not --
Q. Nothing like that?
A. Not that I -- well, not that's clinically significant or recognized as a sign.
Q. Any indication she had any cracking in her skin?
A. Any --
Q. Cracking in her skin?
A. Tracking?
Q. Cracking.
A. Cracking.



Page 117

Q. You know, fingertips cracking, or dry skin, people with dry skin?
A. Oh, I'm sorry. I thought you said tracking. I misunderstood. I do not see evidence of that, but -- and I would not expect that to be related to dehydration. That's a separate issue than dehydration.
Q. You said sunken eyes is kind of a benign sign or symptom, if you will, but any indication she had sunken eyes during the days that she was at the Justice Center?
A. I didn't see that the nurses made any comment about her eyes one way or another.
Q. Skin tinting. By that do you mean, what, a yellowish color of the skin or --
A. No. It is tent, t-e-n-t, not tint as in color.
Q. T-i-n-t?
A. Right. So if I'm --
Q. Tenting of the skin.
A. Right. So when you pull it up, your -- my skin is elastic and goes back.
Q. I understand.
A. If it stays up, that is called tented skin.

Page 118

Q. Any indication of tented skin?
A. I didn't see that that was checked for.
Q. Would there be any change in coloration of someone's skin if they were withdrawing from opioids?
A. You would not expect so.
Q. Capillary refill, I think, is where you press down on the skin and take your finger off, and how quickly it goes from white back to pink skin color?
A. Correct.
Q. Any indication of that with Martie Clark?
A. That is a late sign of dehydration, and I think there is some descriptions about her -- her skin being cold, et cetera. So that might well be a description of delayed capillary refill late in the course of her -- late in the course of her illness.
Q. Do you believe that she developed an increased pulse or heart rate while she was at the jail?
A. I believe that it is most -- that it is most likely that she did. I did not see it, that her -- I did not find evidence that her pulse rate was measured at all past the time of the George-100 on 8/4. So in the last 29 hours of her death, I didn't see that her pulse rate was measured at all.

Page 119

Q. So you did not see anything documented that her pulse rate was elevated or increased, but you're saying you don't -- you can't tell what it was one way or the other over the last 24 to 29 hours?
A. Right. It was recorded as 75 on the morning of 8/4 at 10:40, and that's the last time I see that her heart rate is measured in the course of this incarceration.
Q. That's normal; is it not?
A. 75 is within the normal range, yes.
Q. And the recorded heart rate prior to that, all the recorded heart rates prior to that were all normal; were they not?
A. I'm going to turn to that page. To the best of my recollection, they were, but let me verify that. Yes, during that incarceration, they were, or they were recorded as being normal.
Q. Nothing recorded in the chart that would reflect an elevated heart rate?
A. Nothing recorded at all in the last 29 hours that she was alive.
Q. If her vitals would have been taken the morning or afternoon of the 5th of August, do you know what they would have shown?
A. I do not know what they would have shown

Page 120

with certainty. I believe that more likely than not -- more likely than not her heart rate would have been elevated at that time.
Q. To what level? And, again, I know this is basically an opinion you're rendering, but --
A. I do not -- I do not know.
Q. Any indication that her blood pressure was significantly dropping over her time there at the jail?
A. Her blood pressure was taken once on the day of the 3rd, once on the day of the 4th, and once on the morning of the 5th. So one time a day, and those measurements were not -- were not decreased.
Q. In fact, Nurse Henke took it at 9:07 a.m. on the 5th, and it was 118 over 72?
A. That's what was recorded. No heart rate was recorded at that time.
Q. Is there a correlation between blood pressure and heart rate?
A. Yes. I mean, I'm sorry, the heart rate is -- you would expect it to elevate before you would expect the blood pressure to decrease. So blood pressure is a later sign of increasing dehydration than heart rate.
Q. Assuming that her heart rate would have



Page 121

been normal at 9:07 a.m., at the time that she had a normal blood pressure reading on April 5th, 2014, assuming that to be true, you would admit --
MR. BYRD: Did you say April 5th?
BY MR. HOJNOSKI:
Q. August 5th. August 5th, 2014, roughly 9:07 a.m., that if her heart rate was normal at that time, which it would have been the same time that she had a normal blood pressure reading, assuming those two things are true, you would agree that there would have been nothing by way of her vital signs to suggest she was dehydrated?
MR. BYRD: Objection.
THE WITNESS: Would you read the question back, please?
(The record was read.)
MR. BYRD: Note the objection.
THE WITNESS: I would say that if her heart rate was normal at that time and her blood pressure was normal at that time, those would all be normal blood pressures. The most likely scenario in dehydration is that the vital signs would still be normal. So they're fairly late findings of dehydration, and that those would not have been present with that

Page 122

blood pressure.
BY MR. HOJNOSKI:
Q. All right. So assuming that her vitals -- well, we know her blood pressure was normal at roughly 9:07 a.m. on August 5th, and just assuming that her heart rate continued to be normal as it had been measured the prior three or four days, was there any sign or symptom, that you're aware of, as of the morning of August 5, 2014, to suggest that Martie Clark was dehydrated?
MR. BYRD: Objection. Well, number one, if you have in the record somewhere where her blood pressure -- I mean, what her heart rate was at that time, if you will show it to me, it will give me a better -- I then can evaluate whether it was elevated or not. And I believe that she had been showing significant signs of dehydration and muscle spasms for several days. In fact, the day before, she had had very significant signs and symptoms of dehydration.
BY MR. HOJNOSKI:
Q. What would those be?
A. Well, she was having muscle spasms, significant muscle spasms, the day before, and she -- that continued, nausea and vomiting and diarrhea, for

Page 123

multiple days.
Q. On the 4th, August 4th, during the George-100 call, she had 97 percent saturation. That's normal, right?
A. That is a normal oxygen saturation.
Q. She had a 110 over 60 blood pressure, that's normal range?
A. That is in the normal range.
Q. 75 heart rate, pulse, normal?
A. That's what was recorded.
Q. 97 temperature, not outside the range of normal?
A. That is recorded that way, that's correct.
Q. 16 respirations?
A. Those are the numbers that were recorded that day.
Q. And so although she had some stiffness, which -- and she was assessed for possible seizure, correct?
A. That is a -- that is what they called the George-100 about.
Q. Do you believe she had a seizure on August 4th?
A. I believe it is more likely than not that she did not have a seizure on that day, but, in fact,

Page 124

had severe muscle spasms due to electrolyte abnormalities.
Q. So is it your opinion that her only potential sign or symptom of dehydration on August 4th, 2014 was muscle cramping, muscle stiffness?
A. I'm sorry, ask it again. That was the only sign of dehydration?
Q. Yeah.
A. No. Her inability to -- her inability to walk, her -- we have the findings on each of the -- on the assessments before that, when she's having vomiting and diarrhea. The significant problems that she had on the 4th indicated significant -- a significant problem that needed evaluation, that she had severe -- she wasn't able to stand. She had muscle cramping, and an abnormal mental status on that day.
Q. But she was able -- she was brought to Dr. Everson, who evaluated her, correct?
A. He said that he did, yes. I mean, he --
Q. Do you doubt that he did?
A. I don't -- I don't believe a -- I do not see documentation of a thorough neurologic exam or -- I saw a description that he thought that she shortly after her seizure was able to move her hand away from



Page 125

a -- to make a voluntary movement to keep from hitting her hand, and that my interpretation was that -- was that he didn't think that she had had a seizure.
Q. Which you agree with?
A. Well, I review the record in hindsight, knowing what happened. And importantly on that day, according to his deposition, he thought that maybe she might have had a -- he thought that she might have had a seizure on that day. And I believe that that requires -- the potential of a new onset seizure in someone that doesn't have a history of seizure disorder requires that they be sent to the emergency department, that's the standard of care for a new onset seizure in someone who doesn't have a history of seizures.
Q. It's your belief that Dr. Everson thought she had a seizure?
A. Well, he --
Q. She was brought to him with a report of potential seizure activity?
A. And he doubted whether she had a seizure or not because he moved her hand out of the way. But what he said in his deposition was, I ordered for her to get Ativan in case that she had had a seizure. So

Page 126

he thought it was possible that she had had a seizure, and, in fact, ordered for her to get Ativan in case that she had had a seizure.
Q. You also testified that he had put in a verbal order to get a lab count, correct?
A. I read that in his deposition. I didn't see any other evidence of that, but -- I did read that he said that in his deposition, but nowhere else did I see that.
Q. Have you ever give a verbal order for labs, lab work?
A. I have.
Q. That's not an uncommon thing to do, is it, to tell a nurse, hey, we need to get labs on her?
A. That's not uncommon at all.
Q. Right.
A. It's incumbent upon the physician to follow up on the labs. If one needs labs, you follow up on the lab results.
Q. Right. When Nurse Henke saw Martie Clark on the morning of the 5th, she charts that she encouraged her to take fluids, she gave her ice and juice. She recorded her blood pressure, and she also gave her her detox meds that morning; do you recall that?

Page 127

A. I don't recall that she was the one that dispensed the detox meds on that day. I know that she made that nurse's note that you're just describing. I don't know that -- it might well be in there that she was the one that dispensed the detox meds, someone did, and I can probably tell you the exact time that they gave them, but it was possibly her.
Q. I'll represent to you that the M-A-R, the MAR, reflects that she gave the detox meds that morning.
A. Okay. I didn't -- I didn't see an MAR. I saw only the -- well, I mean, mine is a -- I guess maybe it is an MAR. It's a chronological administration of medications. It's not exactly an MAR, but --
Q. How many times did Martie Clark receive at least what NaphCare referred to as her detox medication, her comfort medications?
A. They were ordered three times a day for seven days. They were not given but twice a day on any of the days except for the third. So they were on the -- they were not given at all the 1st. They were given on the 2nd twice. On the 3rd, they were given three times. On the 4th, they were given

Page 128

twice. And on the 5th, they were given twice. So I didn't -- I wasn't counting on my fingers how many times it was, but that's the number of times.
Q. Ever since they were ordered, once that order was put in, she got the meds at least twice a day, correct?
A. They had been ordered three times a day, and they didn't -- she didn't receive them as they had been ordered, but she did receive them two times a day.
Q. Are you aware of any indication that she had trouble keeping those meds down?
A. I am not aware of any description in the chart one way or another. I would expect that she would have had trouble keeping those meds down, but I didn't see a notation in the record one way or another.
Q. You would have expected her to be given some water with those pills each time?
A. That's the typical way one administers meds.
Q. And when your nurses give med pass to inmates, are they also talking to them usually and at least getting their eyes on them?
A. Nurses typically interact with the



Page 129

patients to give them their medications, yes, and record.

(Mr. Barbiere exits the room.)

BY MR. HOJNOSKI:

Q. The meds that, for the record, that were ordered and that Martie Clark received multiple times, she received acetaminophen --

A. Correct.

Q. -- for general -- for pain?

A. Correct.

Q. She received -- I'm not going to pronounce these correctly, so correct me -- promethazine?

A. Promethazine.

Q. Promethazine.

A. It will make it easier if you call it Phenergan.

Q. Phenergan.

A. Phenergan is the brand name.

Q. For nausea?

A. Correct.

Q. Dicyclomine?

A. Dicyclomine.

Q. Dicyclomine.

A. Bentyl, for stomach cramps.

Q. And loperamide?

Page 130

A. There you go. Imodium, for diarrhea.

Q. Any criticism, objection, or comment on that combination of medications that she was ordered?

A. My main criticism about that is that there was no ongoing assessment to see whether her -- whether those medicines were helping or not helping, how severe her withdrawal symptoms were, and how severe her dehydration was becoming. So there was no assessment of the effectiveness or lack of effectiveness or no documentation about -- that she even tolerated those medications.

So the medications in and of themselves, I don't have criticisms about. They were not administered as directed by the doctor, and there was no ongoing assessment of her severity of her symptoms.

Q. How many times are meds passed to inmates at your facility?

A. There are two main med passes. Medicines are given three times a day. There are two main med passes, with an additional medicine. We will give medicines however many times a day is required, but --

Q. But the normal is morning and evening?

A. With a noontime med pass that's limited.

Page 131

I mean, we --

Q. Blood pressure or something specific?

A. Three times a day, that's right.

Q. Antiseizure medications or something?

A. That's right.

Q. Do you recall Jackie Henke's testimony in terms of her interaction with Martie Clark the morning of August 5th, other than what's charted?

A. I do generally. I mean, if you direct me to it, I can refresh my memory, but I generally recall her testimony.

Q. I'll represent to you that Jackie Henke testified that she talked to Martie Clark that morning when she gave her meds, that she encouraged her to continue taking fluids. That Martie said she was feeling better. That she ate a sandwich. That she wasn't vomiting anymore, and that she was having just a little bit of diarrhea still.

A. I certainly didn't see anything like that in the medical record, and I don't recall seeing that in the -- in the investigative report that -- in her statements near the time. I do recall -- I don't recall that it said all of that that you just said in the investigative statement. I recall --

Q. What do you recall her telling

Page 132

investigators in very close proximity to this event in terms of her interaction with Martie Clark that morning?

A. That she had seen her once before, at 10:00 that morning, and that, in summary, or in short, that she thought she was all right.

Q. Doing better?

A. I'm not going to stay doing better. I don't recall -- that is a -- that may be so, but I recall that she was doing okay that morning at 10:00. What I -- what I also recall in there is that there was not a complete set of vital signs taken. So there was not a pulse taken.

There was no drug -- there was no drug withdrawal assessment done, no kind of -- no type of assessment to the monitoring to -- at all done, or no structure, no withdrawal check. It seems that the withdrawal checks stopped when she came to medical observation. In other words, she had gotten -- she had gotten some amount of withdrawal observation on the floor, but that she didn't get that at all and had very limited interaction once she came to the medical unit.

Q. Well, isn't the truth she had more interaction? She's in the medical unit, and eyes are



Page 133

on her on a much more regular basis?
MR. BYRD: I'm going to object. Go ahead.
THE WITNESS: It looked the opposite to me.
BY MR. HOJNOSKI:
Q. From the chart?
A. It looked the opposite to me. She had less vital signs taken. She had less nursing assessments done. It looked like less involvement.
Q. What is -- if I were to get my hands on the protocols at the Lafayette Detention Facility in terms of the procedure for how often vitals are to be taken of any inmate who is withdrawing from opiates, what would those protocols say?
A. I don't know -- I don't believe that they are included.
Q. Don't exist?
A. That the amount, the frequency of withdrawals, is not included in that. It's a medications -- what I have is medications, symptomatic medications.
Q. But you're here to say that the NaphCare staff aren't taking vitals regularly enough. What's your protocol? Your facility isn't even staffed 24 hours a day.

Page 134

A. That's correct.
Q. So how often are people getting vitals?
MR. BYRD: What, are you talking about generally or --
MR. HOJNOSKI: People withdrawing.
THE WITNESS: At my facility, I don't have a specific requirement of the times that people have to take vital signs. And one of the reasons that I don't is that I use buprenorphine, which eliminates most all the withdrawal symptoms.
So I have relatively few -- people have relatively mild -- very mild symptoms from opiate withdrawal, because they're being treated with buprenorphine after the first day. So our main concern is to see that they're in enough withdrawal to start the buprenorphine, and that eliminates the withdrawal symptoms.
BY MR. HOJNOSKI:
Q. What if someone is sick, have the stomach flu or diarrhea or vomiting, how often are their vitals checked at your facility?
A. It depends upon the particular order of -- I don't have a particular -- I don't have that detail of standing order of protocols.

Page 135

Q. Is that clinical judgment?
A. Yes.
Q. And part of -- I mean, we're talking about vitals in terms of hard data, but isn't part of assessing ones vitals talking to them? Are you warm? Do you feel warm? Are you sweating? Do you have chills? Is your heart rate up? I mean, you could -- everybody can sense things in their body, can they not?
A. Certainly nursing assessments are a very important part of taking care of patients, absolutely, uh-huh.
Q. So if someone is really sick at your jail, how do -- what level or how regularly are they getting assessed?
A. That entirely depends on the condition and where they're housed, et cetera, that there's not -- I can't give you a specific answer as to -- depends on what condition they have, like, as I told you before, what medications they're receiving, whether they've been given buprenorphine. So it all depends.
Q. Are you aware of any national standards that suggest how often someone's vitals should be checked by a nurse when they're withdrawing from opioids?

Page 136

A. Let me see if -- let me review NaphCare standards and -- I mean, policy, and see if they have a particular time frame. I thought I had seen -- I thought that I had seen that NaphCare had in their policy that it was -- they were to be checked twice a day. I don't see that in this policy, and perhaps that was something that I got from another -- I thought that NaphCare -- and I think that would be reasonable, twice a day would be reasonable.
Q. More than probably the inmates that your facility would get, correct?
A. Not necessarily.
Q. Do you know NaphCare as a corporation? Have you dealt with them in the past, other cases?
A. I have not.
Q. Okay.
A. I mean, I have heard -- so I do know NaphCare. I guess I should say, yes, I do know NaphCare.
Q. You know of them as a correctional provider?
A. That's right. I believe they're based in Birmingham, Alabama, I believe.
Q. The policy that I think you just took a moment to review is the NaphCare -- is it labeled



Page 137

the -- I forget the title of it -- the intoxication withdrawal and detoxification policy?
A. That's right.
Q. Do you have any objection to that written policy?
A. I don't necessarily have an objection to the policy. It says in number 11, all initial and ongoing assessments will be documented on the detoxification flow sheet. I didn't find that. And then it says what assessments may include, and it has then the assessment tools. I didn't see that any of those assessment tools were used in this case, and -- but the policy itself, no, I didn't have a problem with.
Q. Do you or your staff ever render any type of medical care or treatment, including assessments, that's not documented?
A. I am certain that each -- every provider, every provider, provides some amount of care that is not documented.
Q. And there's -- I mean, a lot of it's verbal communication. You're on your phone with your nurse practitioner or your nurse or a correctional employee, and you're discussing patients or inmates, you're talking to inmates when you see them, I mean,

Page 138

you're not always right there at a computer or have a pen in your hand, right?
A. Documentation is a very important part of delivering medical care --
Q. No doubt.
A. -- for -- one of the main reasons, to document what one did so that people can later go back and look at the care that you delivered. If it's not documented, then it makes -- it makes it much more difficult to determine what care was actually delivered.
Q. But you don't subscribe to the belief, I assume, that because something is not in his chart, because there aren't vitals recorded on a particular day, does not mean that they were not done? You'd like to see it, and I understand that, but --
A. So as a general statement, if you're asking me, do I -- I heard a general statement, do I subscribe to that? And, no, I don't believe that just because something is not written it is not done. However, in this case, as a for instance, there is no detox -- there is no withdrawal assessments done, and I believe that they weren't -- I mean, I believe that they were done to the extent and documented to the extent that they are in the chart.

Page 139

In other words, I don't believe that there are additional, unless -- you could correct me if I'm wrong, but I don't believe that there were detox assessments done when there were not detox assessments recorded. I don't believe that in this particular case.
You're -- so you're -- so as a for instance, I don't believe that one can assume that additional sets of vital signs were taken, more than what has been recorded in the chart or the additional detox assessments. I don't believe that it is -- I would not presume that they occurred, but as a -- your question was different. It's as a general rule, does -- do I subscribe to the theory that if it wasn't recorded, it wasn't done? And, no, as a general rule, I don't.
Q. But, for example, in this case, I mean, and I think you've already acknowledged this -- acknowledged this, that each time that Martie Clark is receiving her medications, her four medications, that a nurse is having some interaction with her, handing her the pills, giving her a cup of water, likely talking to her?
A. The person who was dispensing the medications --

Page 140

Q. Yes.
A. -- you said the nurse, and you may know that only nurses, you know, do medicine pass. Some places have pharmacy techs or med techs or somebody else, or even correctional officers dispensing meds. So I don't know for 100 percent -- I don't know for 100 percent certain it was nurses, but someone passed her the medications twice a day and had interaction with her, yes.
Q. In fact, we know that Robin Brown passed her her meds at 1:50 p.m. on August 5th and likely interacted with her?
A. That is recorded as the last time she was administered medications. And we have no record about did she take them, was she able to -- was she able to swallow them, there's no documentation about that.
Q. Was there any treatment that was rendered to Martie Clark that you thought should not have been rendered?
A. On the 4th, I believe, the treatment of moving her to the medical unit for observation should not have been done. I believe she should have been sent to an emergency department on that day.
Q. Because of suspected seizure?



Page 141

A. Well, but for that -- that would be a reason, or if not suspected seizure, then severe muscle spasms and muscle cramps and the possibility of electrolyte abnormalities developing in the phase of a significant opiate withdrawal. Either one of them would be serious enough to have sent her to the hospital on that day.
Q. So it's your opinion the standing alone muscle cramping and stiffness is a sufficient reason to send an inmate out of the facility to an emergency room?
A. What's described there is something different. What -- I would describe it as muscle spasms. So I believe that what she was -- what was being described is something different than muscle cramping. Her actions or her symptoms at that time is something different than muscle cramping.
Q. And is that your opinion, because you're reviewing this case in hindsight, knowing that she passed away the next day?
A. Well, certainly I have reviewed the case in hindsight, that is -- that is how I review cases, but I believe that the symptoms she was presenting on that day indicate that she was having significant withdrawal symptoms, followed by muscle spasms, which

Page 142

a prudent physician would have recognized could be due to electrolyte abnormalities, and -- and warranted the checking of her electrolytes, specifically her potassium. And Dr. Everson, in fact, in his deposition says that he wanted to do that.
Q. Do you have a policy or protocol at your facility of when an inmate is to be sent out to the hospital, or is it clinical judgment, case by case?
A. It is clinical judgment, case by case. The correctional officers, the nurse, and me all have the authority to -- and the nurse practitioner all have the authority to send the patient out to the hospital if they -- so we all have authority to.
Q. And is -- what's the economic consideration, if any, that you -- is there any economic consideration to making that decision at your facility? If you sent everybody out, I mean, would that cause a problem?
A. Yeah, I was going to say, not directly to -- I mean, in other words, I no longer am directly responsible for care. I'm an employee of the county, but that would become a problem if I overutilized services, yes.
Q. Because who pays for that transport by

Page 143

ambulance and that emergency room treatment?
A. In my situation?
Q. Yes.
A. The county.
Q. The county.
A. Well, or possibly the U.S. Marshals Service, it depends on who the detainee belongs to.
Q. The decision whether or not to send Martie Clark to the hospital on August 4th of 2014, that -- would you agree that that was within the clinical judgment of Dr. Everson?
A. I agree that he made the decision not to send her out, yes, I certainly would. I mean, he made --
Q. As part of his clinical assessment?
A. He made that decision, yes.
Q. And are you saying that's below the standard of care?
A. Yes.
Q. Medical practice?
A. Yes.
Q. So when we compare and contrast that opinion you've just given to the opinions you've rendered in these other cases as a defense expert where there was issues about sending individuals to

Page 144

the hospital or not, you think that opinion stacks up?
A. Yes. I believe that -- I believe in this case that the new onset of a seizure or the belief that a person had a new onset of a seizure mandated -- the standard of care mandates that she be sent to the -- to the hospital for evaluation, because you don't have the facilities in which to do the -- do the evaluation for new onset seizure in that -- my jail or in the Hamilton County Justice Center. And so I believe that it appeared clinically that it was a new onset seizure, and Dr. Everson himself recognized that it was the potential of a new onset seizure by ordering a dose of Ativan, which is not used for opiate withdrawal but is used for seizures, and he failed to send her to the hospital.
Q. Assume for the sake of argument that she went to the UC Emergency Room, University of Cincinnati Emergency Room, sometime during the afternoon of August 4th. She was assessed at the emergency room, and discharged back to the Justice Center.
Is there anything after that point in time -- let's say she came back that evening sometime. Was there anything going forward over the



next 24 hours that would have caused any medical staff or individual at the jail to send her to the hospital before her event at the end?

A. Well, had she gone to the hospital, I believe they would have done electrolytes and would have determined that she had severe electrolyte abnormalities. They would have replaced them and would have likely sent her back with therapeutic interventions to replace her electrolytes. So you're saying if -- you're asking me to presume that they had done -- they had replaced her electrolytes and they had then sent her back, is that what you're asking?

Q. Well, is it your opinion that UC Hospital would have admitted her?

A. It is my opinion that they would have at least treated her -- that she had significant electrolyte abnormalities at that time, and that they would, more likely than not, have detected those and would have treated those electrolyte abnormalities.

Q. And, again, you base that solely on the muscle cramping?

A. And the severe opiate withdrawal symptoms that she has had for a number of days.

Q. Even though the next morning, when she

talks to Nurse Henke, says she's feeling better, no more vomiting, she's taking fluids, eating a sandwich?

A. I recall -- I don't recall Nurse Henke's investigative interview or even her deposition to be that, but more along the lines of that she was lying in bed, and perhaps she didn't even see her sit up. So I didn't -- I don't read that -- my interpretation of Nurse Henke's interaction with her at 10:00 a.m. was not necessarily as you describe.

Q. Any other treatment that you believe or decisions that should have been made that were not made by the NaphCare medical staff?

A. Let me turn to my report. So, yes, I believe that they should have implemented regular assessment protocols for her for the entire time that she was there. So I believe that they should have done adequate assessments during the time that she was there.

I believe their policy was that it was done twice a day. The -- in the descriptions that I have of each of the things, they were done once a day, and then the -- and one or more of them, a couple of them, even though the form is there, it's

actually basically not filled out by a person.

I believe her name is Leticia Smith, yeah. Her withdrawal assessment forms basically aren't even filled out. So I don't believe they were done in accordance with the NaphCare policy in place at the time that they be done each shift. So that would be one thing that I would say that should have been done.

In addition to that, she should have been provided the symptomatic medications as prescribed three times a day, with some documentation about their effectiveness or her ability to even swallow them. There's no -- none of that done.

There should have been some type of assessment, some type of clinical assessment to assess the severity of her withdrawal symptoms, which was not done in this case. COWS is an example of that, but it's not the only one, and, in fact, just -- just listing of symptoms could be satisfactory. We have those.

We talked about that I believe she should have been sent to the hospital at the time of the emergency condition that she had on 8/4. And then as I say on page 14 in number K, when she comes to the medical unit, she appears to have less frequent

assessments, not more. She doesn't have her -- she does not ever receive any lab test. She doesn't ever receive -- I didn't see evidence that she ever received the Ativan, which Dr. Everson gave her, and I believe that her clinical condition was deteriorating.

My interpretation of the -- Nurse Henke's report was that at the very least, she was -- appeared clinically worse that day, wasn't able to sit up, and should have been taking some type of more -- more aggressive treatment and/or more aggressive monitoring of her. In fact, less was done.

And then, most significantly, when the CO found her about an hour before she died, I think that Nurse Henke should not have said, there's nothing I can do, but should have, in fact, gone to assess her and -- and would have found her in extremis at that point, and would have sent her to the hospital. Those are the main things that I can think of.

Q. What is the average number of -- or average amount of time that it takes you to get a lab value done on an inmate at your facility in Lafayette County?

A. In our facility, we have courier pickup --



Page 149

courier pickup in the evening, and the labs are done overnight. So they are actually turned out overnight, approximately mid -- I'm not sure exactly what time, 4:00 in the morning, each morning.

Q. What is the name of the lab that you use?

A. AEL, American Esoteric Laboratories, AEL.

Q. Where is that located?

A. I think it's a nationwide company.

Q. So if we make contact with AEL in Oxford, Mississippi, they're going to tell us that they can always turn around labs for the Lafayette County Detention Center in less than 24 hours; is that your testimony?

A. Well, first of all, I need to probably clarify that. There are certain tests that they don't perform each day. So there -- I mean, there are tests that -- some tests they can turn around -- so they have a courier that picks up in Oxford at not just the jail, but in multiple facilities.

They courier the specimens to a central laboratory somewhere in the Mid-South, I don't know exactly where it is, and they batch run those tests overnight in general, but -- they don't provide any guarantee about -- that they will be turned out overnight or whatever, but in general, yes, they're

Page 150

couriered there and done overnight.

Q. If you gave a verbal order for a complete lab count, metabolic panel --

A. Right.

Q. -- and you didn't get that lab result back in 24 hours, would you believe that that's below the standard of care for you?

A. First of all, it would all depend on the clinical situation about whether you were waiting on that to make a -- make a determination. So it well could be.

On the other hand, there are, as a for instance, other tests which are more routine in nature, HIV screenings that are done, and so we wouldn't expect those to be turned around anytime. So it all depends on the clinical nature of whether you're -- whether one is going to use that information for clinical information.

So certainly had I been concerned about somebody having dehydration and sent -- I mean, sent off lab tests in lieu of sending a person to a hospital, yes, I might have even tried to have a stat courier pick it up and -- I'm not saying that's -- you haven't given me enough information to say what the standard of care would be in a particular

Page 151

situation, but the standard of care could be that if you weren't going to send the person to the hospital, you would need to arrange for stat lab work and a special courier to come get it, and you might expect it to be back in four hours.

I'm not saying that -- I'm saying that could be the standard of care in a given situation. So it would all depend on the clinical situation.

Q. Assume that Martie Clark was not severely dehydrated on August -- the morning of August 5, 2014, assume that's true. What do you believe that she died from?

MR. BYRD: Objection.

BY MR. HOJNOSKI:

Q. If you have an opinion.

A. Well, you're asking me an impossible -- so you're asking me to presume that what I -- that what I believe to be the cause of her death didn't occur. So I can't give you an answer to that hypothetical I don't think.

Q. Assuming that Martie Clark died as a result of a sudden cardiac death due to years of chronic heroin use seen on the pathology slides that Dr. Balko evaluated, assuming that's true, would you agree that that condition of her heart was not

Page 152

reasonably foreseeable or known to any of the providers?

MR. BYRD: Objection.

THE WITNESS: I'm not an expert in cardiac pathology and don't have an opinion about that.

BY MR. HOJNOSKI:

Q. But if she died for the precise reason that Dr. Balko says she died, due to her heart condition, not due to any electrolyte abnormalities or dehydration levels or hydration levels, do you have any reason to believe that that condition should have been diagnosed or treated by anyone at the Hamilton County Justice Center?

A. I believe I understood the question to be that presuming that she died of a heart arrhythmia. If she did die of a heart arrhythmia, I believe it would have been due to electrolyte abnormalities, which should have been detected at the Hamilton County Justice Center.

Q. Do you believe she died from a cardiac arrhythmia?

A. I'm -- I'm not -- I am not an expert necessarily in that. I believe that almost everyone dies -- their hearts -- everyone's heart stops from something, which normally involves some type of



Page 153

arrhythmia in order for that to occur, bradyarrhythmia, ventricular fibrillation.
I don't know -- I mean, that almost -- everyone dies at the last moment -- at the last moment of some arrhythmic death. I mean, some -- their heart stops, which is an arrhythmic -- which is a lack of a heart rhythm. That is, by definition, of arrhythmia.
Now, the series that led up to that can be different in different cases, lack of -- lack of, you know, blood, they have no blood in their system. They have a gunshot wound. I mean, do you follow what I'm saying?
Q. I follow what you're saying, yeah.
A. But, now, about the specific cause of her arrhythmia, it is my belief that if she died of an arrhythmia, it would have been due to an electrolyte abnormality, the same electrolyte abnormalities that were causing her muscle spasms the day before.
Q. And the same abnormality that did not result in any change in her blood pressure the morning of August 5, right?
A. That's a question?
Q. Yeah. I mean, you're saying she had an electrolyte abnormality on the morning of August 5th

Page 154

and even prior to that, right? So why was her blood pressure normal?
A. Electrolyte abnormalities don't affect your blood -- don't affect blood pressure or heart rate.
Q. You told me a sign of dehydration is a lower blood pressure, correct?
A. That's right. You were asking me about electrolyte abnormalities.
Q. So one can be dehydrated but have normal electrolytes?
A. Those usually go hand in hand.
Q. Right. Is a sign and symptom of electrolyte abnormality a decreased blood pressure?
A. No. It is a sign and symptom. I mean, decreased blood pressure is a sign and symptom of dehydration.
Q. But not a sign and symptom or symptom of electrolyte abnormality?
A. That's right.
Q. Is it your opinion that Martie Clark had an electrolyte abnormality on the morning of the 5th, or she was dehydrated, or both?
A. Well, it is my opinion on the morning of the 4th when she had -- you said the morning of the

Page 155

5th?
Q. Yeah.
A. So it is my opinion that on the morning of the 4th, she had both dehydration, and she likely, more likely than not, had muscle spasms due to an electrolyte abnormality on the morning of the 5th -- I mean, I'm sorry, I'm sorry, on the morning of the 4th. I do not see any evidence in the record that she received any treatment for that. Therefore, I would believe that, more likely than not, she still had that condition on the morning of the 5th, and likely worse. That's the long answer to your question about the 5th.
Q. And I'm just trying to understand how it is that she was dehydrated at a minimum on the 4th and the 5th, according to you, but yet she had completely normal vitals on the 4th and a normal blood pressure the morning of the 5th.
A. I've -- I've said several times that changes in vital signs, pulse and blood pressure, are late -- very late findings.
Q. So the finding is so late that that finding would come post-death? I mean, we know that she dies within how many hours of this normal blood pressure reading at 9:00 a.m. on the 5th?

Page 156

A. You have single -- you have single measurements of blood pressure. We don't know what position those are in. So as a for instance, if one is trying to detect dehydration, it's normal that one would take what is called orthostatic vital signs, because quite often the pulse and blood pressure are normal when a dehydrated person is lying flat.
When they stand up, the blood pressure will go down, the heart rate will go up. Those are called orthostatic vital signs. And so a single normal reading, while we don't know what position the person is in, gives us little indication about their hydration status is my point.
Q. Who -- there's a lot of people named as defendants in this case. Do you know all the defendants that are named?
A. No.
Q. Do you know why the plaintiff decided to name Dr. James Coulter as a defendant?
A. I do not.
Q. Do you have any opinions against Dr. Coulter?
A. I do not.
Q. Do you know who Dr. Coulter is?
A. If he would -- the only opinion that I



Page 157

would have is if he were the person who was responsible for insuring that NaphCare employees followed their policies and procedures on intoxication and withdrawal, then he failed to ensure that they followed their policies.

Q. You're guessing. You don't know who it is, do you?

A. No. What I'm saying is, though, the medical director of the facility --

Q. Was Dr. Everson.

A. Okay. I'm fine with that. I didn't know that for certain. I understood that -- I understood that he said that was his title. I didn't know if, per chance, he was really not the medical director and there was a separate medical director.

Q. Do you have any opinions against Dr. James Coulter?

A. Not that I'm aware.

Q. Any opinions against Dr. Leland Johansen?

A. To the best of my knowledge, that was the psychiatrist that worked there, and I don't believe that he was either asked to or ever did evaluate Ms. Clark, or that she had a psychiatric condition that would have warranted assessing -- I mean, consulting him.

Page 158

Q. So no, correct?

A. Correct.

Q. And you're not a psychologist or a psychiatrist, are you?

A. I'm not, but I render a good bit of -- a good bit of mental health care in a jail.

Q. Nurse Tamara Hedges, any opinions against Nurse Hedges?

A. I believe that in general, NaphCare employs nurses who were to work and who were scheduled to do assessments on Ms. Clark during the period that she was incarcerated at the Hamilton County Jail, failed to do those assessments as they had been instructed and as were part of the -- instructed by the policies and procedures. So to the extent that she was one of those nurses that was charged with doing an assessment and did not, then I would have a criticism of her.

Q. But I don't want -- I understand this is laborious, but I don't want general opinions from you. I want -- if you have specific opinions against these named individuals, let me know. Because if not, I believe they should be dismissed from the case. And if you -- if there's a reason why these individuals each belong in the case, I want to know

Page 159

what it is from you.

A. I understand.

Q. Is that fair?

A. It is.

Q. If you were named as a party, you'd want that; would you not?

A. I understand. I understand, and I was doing my best to give you that opinion that if -- I do not have information that that nurse was on duty and failed to do the assessments, but someone -- that may be in the record, that I am not aware of, and I wouldn't know specific -- so, for instance, I would not know the nurses that -- I don't know the nurse that was supposed to do the assessment on the morning of the 5th, the detox assessment, I don't know who that nurse was.

And so I don't have a way of telling you, it's this person, and I have an opinion that they fell below -- their actions fell below the standard of care. I have to give you that general thing. And I don't know the name of that person or, as you just said, whether it was or was not this person you just mentioned.

Q. Just so I have a record, I just need to go through the remaining individuals, and you can say I

Page 160

don't know who they are or don't know specifically. I understand what you said generally.

A. That's right. And so that's my general -- that's my general statement, and then you can ask me about people individually.

Q. Nurse Sharon King?

A. I don't recall if I -- I may have seen her name as a -- as one of the people -- nurses there, but I don't have any particular --

Q. What I'm asking for, if you have anything specific that you know of, as you sit here today, that are criticisms of the standard of care or opinions in terms of how these individuals caused or contributed to the death of Martie Clark, I want you to tell me.

A. And with given the caveats that I have told you that I believe in general the nurses who were working there, I'm talking about the nurses who were assigned and who were working there and who were required by the standard of care and by the NaphCare policy and procedure to do assessments on Ms. Clark and had failed to do that, I have -- I have that general -- I don't know who those people are, and I don't know how a -- I don't know how a person in my -- I don't know how I would know the person's name



Page 161

if they were not on the -- if they are not -- they didn't write a note saying that they didn't do an assessment is my point. So those are all general things.
Q. Nurse Aidreanne Roseman?
A. I don't know her.
Q. Robin Brown?
A. Doesn't -- doesn't ring bell.
Q. You mentioned a Leticia Smith earlier. Do you have any opinions against Leticia Smith?
A. Yes. She did inadequate assessments. Her assessments were inadequate.
Q. You understand she's not named in this case?
A. No, I didn't understand that.
Q. Nurse Jackie Henke?
A. Yes. Nurse Henke is the nurse who, I believe, was on duty that day in the medical unit and when -- when Ms. Clark was in extremis most of that day, and then who told the correctional officer that there was nothing more she could do.
Q. And you believe she should have done something more?
MR. BYRD: He has already testified to that.

Page 162

BY MR. HOJNOSKI:
Q. What should Nurse Henke have done differently? She should have gone and seen her sooner, and anything else?
A. She should have -- some -- she should have completed a detox assessment or an assessment of her hydration status, her -- she should have performed a clinical assessment of her earlier in the day, which she failed to do.
Q. Dr. Everson, is there anything about Dr. Everson that you haven't already mentioned in terms of opinions or standard of care criticisms?
A. The detox orders were, according to NaphCare's policies and procedures, to be put into place at the order of a provider, and they may have mid-levels. I didn't see any names of any mid-levels in this case. They -- the nurse who instituted that said, discussed with Dr. Everson. I didn't see any documentation of that one way or another about that conversation, but I believe that Ms. Clark should have been seen by a provider sometime when she was incarcerated.
Q. Provider, you mean what?
A. It would have been acceptable, for instance, for a nurse practitioner to have assessed

Page 163

her and done a more thorough assessment than the receiving assessment that was done to determine the severity of her -- of her drug use, of her medical condition, of her withdrawal sometime during that period of time.
I believe this should have been done prior to the morning of August the 4th. When it wasn't done prior to the morning of August the 4th, I believe at the very least, Dr. Everson should have done a thorough assessment when she was moved to the medical unit and should have documented an assessment of her condition.
Q. Are you aware of any medical literature that documents an individual who is withdrawing from heroin, who succumbs -- who dies in less than four days due to withdrawal symptoms? Are you aware of any case reports, study, medical literature, where that has happened?
A. It is not normal -- it is not normal for people to die of heroin withdrawal. That is not -- is not a frequent occurrence, and it is becoming more common as the heroin epidemic is becoming more -- more pronounced. And the medical literature is now beginning to come out on deaths due to heroin withdrawals. I have only one -- I have one article

Page 164

which lists some -- some references and which I'll be glad to provide to you.
Q. Any other literature that supports your opinions in this case?
A. Not that I am relying on.
Q. And what I'm asking for is separate from this case, any other instances that you're aware of, either through direct personal knowledge or through the literature, where an individual is alleged to have died from withdrawal symptoms from heroin in a period of four days?
A. Specific -- I guess --
Q. Any other individual in the world.
A. Yes, I believe there -- I mean, I'm sorry. You're asking me if there's research that shows -- I'm -- please ask me the question again. I'm sorry.
Q. Are you aware through personal knowledge or through any medical literature or any other source of an individual who dies within four days of withdrawing from heroin, secondary to dehydration or withdrawal symptoms?
A. I am aware of individuals dying within a short period of time. I don't know whether four days, five days, those are all within the same time frame, but, yes, I'm aware that the literature has



Page 165

information about that. The specific four-day cutoff, as opposed to five days or as opposed to three days, I don't know that I can point you to any particular literature that says when the death -- when the death would occur.

Q. Do you mean how many days an individual has to be dehydrated to die from dehydration?

A. I'm not aware of literature that says a specific period of time, but I believe that certainly a person can die within four days of stopping intake of fluids, or especially because you recall that I talked about that it's the losses that are probably more important than the lack of taking in stuff. So you can certainly -- you can certainly lose enough fluids to die of dehydration within four days.

Q. Are you aware of any individual who died secondary to dehydration, within a period of four days, where they had a normal blood pressure reading within 10 hours of their death and completely normal vitals within 36 hours of their death?

A. I've reviewed -- I've reviewed other cases that are very similar.

Q. Any that you've given opinions on?

A. Not that I recall at this time.

MR. HOJNOSKI: I'm going to take a little

Page 166

break and pass the buck, if you have any questions now, and then we'll wrap this up.

MR. VOLLMAN: You know what? I do not.

MR. HOJNOSKI: Why don't we just take a little quick break then, and we'll try to resume -- or finish or whatever.

THE WITNESS: Okay.

(A recess was taken from 5:03 to 5:10.)

BY MR. HOJNOSKI:

Q. Doctor, how many hours, if you can quantify it, have you spent on this case to this point? Excluding your deposition today, of course.

A. I have -- I can't quantify that specifically. I can tell you that my rate is $500 an hour, and that I was paid $8,000. So I spent 16 hours on the initial review and the preparation of the Rule 26 report.

Q. Okay.

A. I can tell you that I haven't calculated since that time for the deposition.

Q. Have you done any other work from then -- from your report until now, other than, I guess, your prep for the depo?

A. I reviewed -- I reviewed an additional expert report, and I did my preparation for the

Page 167

deposition.

Q. Oh, that was the county nurse, I think?

A. Yes.

Q. I think they retained a nurse, right?

A. Yes.

Q. You just handed me an article which I haven't read yet, or probably won't take the time to do it right now, but is this an article that you found or was provided to you? It looks like it's an article entitled, "Yes, people can die from opiate withdrawal," in 2016, "Society for the Study of Addiction."

A. I located that through my research.

Q. And it's labeled as an "Editorial"?

A. That's right. It has references. It's as much provided for -- so there is a -- as -- I should let you ask the question.

Q. Go ahead.

A. Is there a question? I mean, is there -- what is your question?

Q. I'm just asking when you found it, how you found it? Did you research it? Was it in your archives? Had you read it and remembered it? Another case, maybe, I don't know.

A. I did a Google Scholar or MedLine,

Page 168

and/or -- Google Scholar and/or MedLine review of deaths from heroin overdoses in conjunction with this case. I -- that is the only article that I have printed out and brought with me today. I mean, I've reviewed a number of other things, but I didn't think they had particular applicability or were not in peer-review journals, et cetera. So that's the article that I brought.

Q. Do you know if there's a statistical incidence of death from opiate withdrawal?

A. I do not know anything -- I do not know about statistics.

Q. One in a million? One in a thousand?

A. I do not know.

Q. Are you aware of any studies or peer-review medical literature that was in existence prior to August of 2014 which indicated that death can occur from opiate withdrawal?

A. I am in general -- I am, in general, aware that people -- that people recognize that you could die from complications from opiate withdrawal, such as specifically from heroin. I can't point you to a particular piece of literature, and, in general, it was thought to be a fairly rare occurrence, which is one of the reasons that it has been so important to



try to pay attention to dehydration, et cetera, to prevent this from happening. It has become much more common.
I'm sorry, the point -- what I was going to say is it is much more common with stronger opiates, heroin, et cetera. So it's becoming a bigger and bigger problem.
Q. Dying from withdrawal?
A. It is becoming more and more common, yes.
Q. What do you base that on, this article or other sources?
A. No, my clinical experience.
Q. So have you seen it in your own clinical eyes? Have you seen this happen?
A. I've seen -- I've seen case reports, yes.
Q. I want to know about those. What other reports have you seen?
A. I don't have that -- I don't have that with me today. I mean, I don't have any specific cases that I'm pointing out to you. I'm just saying in meetings, in addiction medicine meetings, it has become the presentations. It has become more and more common -- common knowledge that people can and do die from opiate withdrawal.
Q. Have you talked to other physicians who

have had patients die from opiate withdrawal?
A. I have attended seminars, presentations, on that topic, but personally I have not -- I have not personally interacted with the doctors who have told me something about that.
Q. So to the extent that there's seminars or reports or literature where physicians are commenting on this phenomena that people can die from opiate withdrawal, is it your view that all of those treating doctors breached the standard of care?
MR. BYRD: Objection.
THE WITNESS: No, that's not my testimony.
BY MR. HOJNOSKI:
Q. So someone can die from opiate withdrawal in the absence of a breach of the standard of care?
A. I certainly believe so, yes.
Q. Had Martie Clark not abused heroin in the past, is it your opinion she wouldn't have died in the Justice Center?
A. Ask your question again, please.
Q. If Martie Clark had not abused heroin in the past, is it your opinion she would not have died in the Justice Center on August 5, 2014?
A. I don't think that's -- I mean, I don't think that's a medical opinion. I mean, I don't

think that's a medical opinion you're asking me, I don't believe.
Q. I'm just asking for cause-and-effect. If she hadn't used heroin, she likely wouldn't have withdrawn from heroin, and at least wouldn't have died from withdrawal symptoms, according to your opinions?
MR. BYRD: I'm going to object, but go ahead.
THE WITNESS: I don't know that I can answer that question. I mean, if she -- I don't know that I can answer that question. So if she hadn't ever used heroin, then she would not have had -- she wouldn't have had opiate withdrawal, and then she wouldn't have not been treated adequately for opiate withdrawal. I guess I'm not --
BY MR. HOJNOSKI:
Q. So you agree with me, I think, that --
A. That's a -- that's not a medical conclusion. I mean, that's -- that's a statement of the obvious, that if she had not had -- ever had opiate withdrawal, her opiate withdrawal wouldn't have been inadequately treated. So if she also -- likewise, if she had been provided heroin, if she

would have not been in jail, she would have -- she would have, more likely than not, continued using heroin and would not have died. So it was the being in jail, having the opiates stop suddenly, and then the opiate withdrawal being inadequately treated that led to her death.
Q. Is that what you tell patients, if you just don't go to jail and continue using heroin, you're likely to live a long life?
MR. BYRD: Objection.
THE WITNESS: Well, you asked me a similar kind of question. If she hadn't gone to jail, she probably wouldn't have stopped using heroin. She probably wouldn't have developed opiate withdrawal. She probably wouldn't have died. That's -- that's my response to your answer.
And, no, I don't tell people that, but I'm just -- that's the -- that's the same -- I mean, that's the same question you're asking me about it. Had she never -- had she never started using heroin, she would never have become opiate dependent.
She would have never had opiate dependence to -- for which to develop opiate withdrawal



Page 173

from, to come to jail to have the opiates stopped, to have been inadequately treated, and had dehydration and die. So that's a whole long series of things that happened.

BY MR. HOJNOSKI:

Q. Do you have an opinion as to Martie Clark's life expectancy had she not died on August 5, 2014?

A. I do not.

Q. Do you have any other opinions, Doctor, that you intend to render if allowed in this proceeding that you have not expressed on the record to this point?

A. My report summarizes and is intended to be a statement of my opinions, and I don't have any other opinions at this time that I know of that I intend to offer. If you want to ask me a particular question, I might have an opinion about something else, might or might not. So -- but there -- I don't know of any at this time.

Q. Do you intend to do any additional work, review any additional information, do any more research, anything else that would relate to your retention in this case?

A. Well, I don't necessarily intend to. If

Page 174

I'm provided additional depositions and asked to review them, I might -- I will intend to fulfill my duty to review additional things, and that will amend my report as it might change my opinion.

Q. I understand. That's always the case. But sometimes I'm in these type of situations and someone says, well, I've been meaning to look at X, Y, and Z, and I haven't got a chance to do it yet. I intend to do it. And if I do, and if it changes my opinions, I'll supplement my report, et cetera. But as of this point, there's nothing on your to-do list that you plan to do going forward?

A. No. This might be an appropriate time to interject with what's not a question. I have two minor changes to my report which I want to tell you about, rather than supplementing my report later. And one of -- really, one of them is not an opinion, but I just believe something different now that I -- just give me one second.

On page 4, number 9 of my report -- page 4, number 9, on 8/3, at 3:00 a.m., and this is Michelle Clark doing a drug assessment form, I say on the last line, Nurse Clark referred Ms. Clark to an advanced clinical practitioner. I think I misread the -- that was the last line on there, and that --

Page 175

you'll look when you -- if you look at the record, but it basically is a -- that's a statement that it expects you to say yes or something afterwards. Do you understand what I'm saying?

I believe I misread the record that -- in that those words are there, but I believe by there being no yes or no after it, she didn't, I don't believe, refer her to an advanced clinical practitioner.

Q. Okay.

A. I thought so in my first reading.

MR. VOLLMAN: What page is this?

MR. HOJNOSKI: It's 4 of his report, paragraph 9.

THE WITNESS: It's in the timeline, yes. It's not an opinion. It's a timeline.

MR. VOLLMAN: Okay.

THE WITNESS: I believe I misread the thing. And then in my opinions, I said somewhere that Ms. Clark -- let me just find it rather than -- rather than -- on page 15, number 2, Ms. Clark died from severe dehydration brought about by inadequately treated opiate withdrawal, leading to severe electrolyte abnormalities and probable

Page 176

rhabdomyolysis.

That "probable" should be changed to "possible," or I can't rule it out. I can't say that to a reasonable degree of medical certainty, that she had rhabdomyolysis.

BY MR. HOJNOSKI:

Q. And what is rhabdomyolysis?

A. It is a breakdown of the muscles of the body. You get protein in your -- you get protein in your --

Q. Your kidneys? You said it earlier.

A. That's right. And she was found on autopsy to have necrosis of some of her kidneys. The pathologist said, I cannot rule out rhabdomyolysis, and I would agree with the pathologist's interpretation of that. I said "probable," and that was a bad choice of words.

Because they didn't -- they didn't check the urine for myoglobin, which you would need to do in order to diagnose that. They didn't check it at the autopsy; so I cannot say that she had probable rhabdomyolysis. It is possible that she had that, or I am unable to rule it out.

Q. A couple just additional questions based on that or based on what you said.



A. Okay.
Q. You said -- first of all, you said a few times in your report and today that you thought that she exhibited severe symptoms of opiate withdrawal during her three or four days at the Justice Center. Is that what you believe and what you said?
A. Yes.
Q. Would you agree that all the assessments and records that were done reflect mild symptomatology?
A. I -- no, I would not. I would not.
Q. Why not? Isn't that a matter of clinical judgment, if someone has mild, moderate, or severe symptoms?
A. Well, I recall at least one set of assessments saying that it was not mild. So you were saying that all of her symptoms were. I think her clinical description does not -- did not indicate mild symptoms.
Q. Also, there was some lab values done postmortem. Do you have any experience in evaluating postmortem lab values as it relates to what would have been reflected in that individual prior to death?
A. Yes.

Q. Tell me about that.
A. About my experience?
Q. Yeah.
A. I served for eight years as my county's medical examiner investigator. So I would rule on the cause and manner of death, including interpretation of postmortem electrolyte abnormalities in the formation of opinions about the cause and manner of death.
Q. Okay.
A. And I would continue to serve as a consultant to my county's medical examiner investigator.
Q. And in this case, the postmortem electrolyte values or lab values, what did they show you or tell you, if anything?
A. I'd turn to the toxicology report and the pathology labs. This is electrolyte determination in the fluid that is found inside the eye, the vitreous fluid, because it tends to be more stable than the blood. The blood has changes to the chemical composition after death, making it much less reliable.
What one can say is that the vitreous sodium -- I'm going to start down the list, but in

the normal way I interpret electrolytes. The sodium is 152.
Q. Yes.
A. That is elevated, and it is relatively stable after death. In other words, that one does not expect a large change premortem to postmortem. So 152 indicates that she suffered from hypernatremia antemortem.
Q. Anything else?
A. About sodium?
Q. About those values.
A. Okay. So, yes, the urea nitrogen and the creatinine are both stable as well. That indicates significant dehydration, and those are stable after death as well.
Q. Potassium?
A. The potassium is 7.6, and the normal range in the blood is 3 1/2 to 5, that is the normal range of potassium in the blood. In the postmortem specimens, that number will be higher because of hemolysis, and so that number is higher, and I believe that pathologists use a range of up to 15 or some number like that.
So it's a different number than the three to five within the antemortem blood. And one cannot

say with certainty what that 7 -- it's not too high -- 7.6 is a lethal level of potassium, too high in an antemortem blood specimen. It does not reflect that in vitreous blood.
It's -- in other words, that -- that number is not necessarily too high. It's within the normal range, but within the lower limits of the normal range, and I don't think that one can say with certainty. I believe that the sodium -- in conjunction with the sodium, there's certainly electrolyte abnormalities that existed antemortem.
Q. Do you know the normal ranges at this -- for this lab for these values?
A. They are -- the short answer is that they didn't put their -- they didn't put their reference ranges.
Q. Right.
A. I believe that the -- one of the experts, I believe it might be -- one of the experts list common ranges for normals in vitreous, which I believe was more or less accurate. But specifically to this lab, although laboratories in general for blood and for vitreous, whether -- they don't vary a lot for postmortem or antemortem specimen. So as a -- what I mean by that is, there's national norms, as



opposed to just laboratory -- there's national norms that labs that do toxicology need to conform to, as opposed to specific.

Q. All right.

A. And the chloride is also -- the chloride is also abnormal. I don't recall at this moment to what it's -- I don't recall at the moment what -- it's -- I believe it's too elevated, indicating electrolyte arrangements in general.

MR. HOJNOSKI: I think that's all I have. Anything? Mark? No. Okay.

______________________________
THOMAS FOWLKES, M.D.

______________________________
Date

- - -

DEPOSITION CONCLUDED AT 5:29 P.M.

- - -

C E R T I F I C A T E

STATE OF OHIO :
: SS
COUNTY OF HAMILTON :

I, Wendy L. Raymer, RPR, CRR, the undersigned, a duly qualified and commissioned notary public within and for the State of Ohio, do hereby certify that before the giving of his aforesaid deposition, THOMAS FOWLKES, M.D. was by me first duly sworn to depose the truth, the whole truth and nothing but the truth; that the foregoing is the deposition given at said time and place by THOMAS FOWLKES, M.D.; that said deposition was taken in all respects pursuant to stipulations of counsel; that I am neither a relative of nor employee of any of the parties or their counsel, and have no interest whatever in the result of the action; that I am not, nor is the court reporting firm with which I am affiliated, under a contract as defined in Civil Rule 28(D).

IN WITNESS WHEREOF, I hereunto set my hand and official seal of office at Cincinnati, Ohio, this 8th day of February, 2018.

My commission expires: December 6, 2021.

S/Wendy L. Raymer, RPR, CRR
Notary Public - State of Ohio

1 DEPOSITION ERRATA SHEET

Our Assignment No. J1287387

Case Caption: ESTATE OF MARTIE CLARK, et al. vs. HAMILTON COUNTY, et al.

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the ______ day of ____________, 20___.

___________________________________
THOMAS FOWLKES, M.D.

2 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________
Page No._____Line No._____Change to:______________
__________________________________________________
Reason for change:________________________________

SIGNATURE:_______________________DATE:___________
THOMAS FOWLKES, M.D.



Page 185

3 DEPOSITION ERRATA SHEET

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

Page No._____Line No._____Change to:______________

__________________________________________________

Reason for change:________________________________

SIGNATURE:_______________________DATE:___________

THOMAS FOWLKES, M.D.

